## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                )
FEDERAL ENERGY                  )      CASE NO.:
REGULATORY COMMISSION,          )
                                )
                  Petitioner,   )
                                )
          v.                    )
                                )
LINCOLN PAPER AND TISSUE, LLC,  )      **JURY TRIAL REQUESTED**
                                )
                  Respondent.   )
_____ )

## PETITION FOR AN ORDER AFFIRMING THE FEDERAL ENERGY REGULATORY COMMISSION'S AUGUST 29, 2013 ORDER ASSESSING CIVIL PENALTY AGAINST LINCOLN PAPER AND TISSUE, LLC

Petitioner Federal Energy Regulatory Commission ("FERC" or "Commission"), pursuant to section 31(d) of the Federal Power Act ("FPA"), 16 U.S.C. § 823b (2012), petitions this Court for an Order Affirming the Commission's August 29, 2013 Order Assessing Civil Penalty ("Order Assessing Civil Penalty") against Lincoln Paper and Tissue, LLC ("Lincoln").

## SUMMARY OF THE ACTION

1.      This is an action for judicial review of the civil penalty assessed by the Commission against Lincoln for fraudulently participating in the ISO New England, Inc. ("ISO-NE") Day-Ahead Load Response Program ("DALRP") from July 2007 to February 2008.

2.      ISO-NE is an independent, non-profit, Regional Transmission Organization serving Massachusetts, Connecticut, Maine, New Hampshire, Rhode Island, and Vermont. ISO-NE ensures the day-to-day reliable operation of New England's bulk electric energy generation and transmission system by overseeing and ensuring the fair administration of the

region's wholesale electricity markets.  The Commission regulates the markets administered by ISO-NE.

3.      ISO-NE administers load response programs that encourage large electric energy users to reduce their electricity consumption or "load" during periods of high or peak demand on the bulk electric system.  This reduction in consumption helps ease stress on the electric grid and also can help lower electricity prices.  Load response programs are a form of "demand response," whereby consumers of electric energy intentionally offer to temporarily reduce their use or "demand" for electricity.

4.      The specific demand response program at issue here is ISO-NE's DALRP, which allowed participants to offer electricity reductions for hours in the next day when New England experienced high electricity prices.  Under this program, participants who offered to reduce their electric load the following day – *and then actually reduced their consumption of electricity* – were paid for the value of the electricity they conserved.

5.      Participants in the program were allowed to reduce their electric energy consumption any way they chose, as long as they actually reduced their electricity usage.  For example, if a factory normally ran three production lines, it could choose to temporarily run only two production lines, thereby reducing its use of electricity.  In such a situation, the DALRP would pay the factory for the electricity savings resulting from its shuttering of the third line.

6.      To participate in the DALRP, a company first had to authorize ISO-NE to measure its electricity consumption from the grid in order to create a baseline that represented the company's normal electricity usage before offering to reduce consumption.  The only way for ISO-NE to calculate how much electricity a participant conserved – and how much money they should be paid for these electricity savings – was to understand how much electricity the

participant normally used when it was not offering to provide demand response by reducing electricity consumption.  That is, ISO-NE would need to compare a participant's reduced electricity usage against the baseline established before participating in the program to determine whether, and how much, that participant actually reduced its consumption and, thus, how much DALRP money the participant was entitled to receive for helping to ease stress on the grid.

7.     In the example of the factory with three production lines, the factory's baseline would show how much electric energy the factory normally consumed – that is, when it operated all three production lines.  If the participant then entered into the DALRP with this established baseline, and then on certain days decided to temporarily reduce its production lines down to two, it could receive a program payment in an amount corresponding to the reduced electricity use from shuttering one of its production lines.

8.      Retail customers throughout New England pay for the value of the saved energy. Specifically, when retail customers pay for electric service, a portion of their payment flows through the service provider to the demand response provider in the form of a load response payment.  Legitimate load response translates to electricity savings that benefit retail customers. Actual reductions of electricity usage are valuable because they reduce demand during peak hours, thereby reducing (1) the cost of electricity to those who cannot (or do not) reduce usage and (2) the strain on the grid, thus lowering the likelihood of a blackout.  But when load response is fraudulent, that participant is stealing money from retail customers.

9.     The Commission's Office of Enforcement ("Enforcement") conducted a thorough investigation of Lincoln's participation in the DALRP.  On July 17, 2012, the Commission ordered Lincoln to show cause why it should not be found to have violated the FPA's prohibition against fraud and market manipulation and the corresponding prohibition in the Commission's

regulations.  In responding to the Commission's order, Lincoln chose to forego an administrative

hearing before an administrative law judge and instead elected under the FPA that the

Commission assess a civil penalty if it found a violation.  Based on the briefing in response to

the Order to Show Cause and its review of the extensive evidence presented and addressed

therein, the Commission on August 29, 2013 issued an order finding that Lincoln devised and

implemented a scheme to fraudulently participate in the DALRP.  The Order Assessing Civil

Penalty, *Lincoln Paper and Tissue, LLC*, 144 FERC ¶ 61,162 (2013), is attached as Exhibit 1 and

incorporated by reference in this petition.

        10.    The Commission found that Lincoln established a false baseline to create the

illusion that it was reducing consumption of electricity and therefore was paid for demand

response that it neither intended to provide nor actually provided.  The Commission further

found that Lincoln's scheme to extract payments for phantom load reductions was a violation of

the FPA's prohibition of energy market manipulation, 16 U.S.C. § 824v(a) (2012), and the

corresponding prohibition in the Commission's regulations, 18 C.F.R. § 1c.2 (2013).  Order

Assessing Civil Penalty at PP 30 and 53.

        11.    The Commission's Order Assessing Civil Penalty directs Lincoln to pay a civil

penalty of $5,000,000 and disgorge $379,016.03, plus interest, in unjust profits to ISO-NE.

        12.    As Lincoln did not make these payments, the Commission seeks, pursuant to FPA

Section 31(d)(3)(B), 16 U.S.C. § 823b(d)(3)(B) (2012), an order from this Court (1) affirming

the Order Assessing Civil Penalty against Lincoln with a corresponding judgment, (2) requiring

Lincoln to pay the $5,000,000 civil penalty, and (3) requiring Lincoln to disgorge its

$379,016.03, plus interest, in unjust profits.

## PARTIES

13.    FERC is an administrative agency of the United States, organized and existing

pursuant to the FPA, 16 U.S.C. § 791a *et seq.*

14.    Lincoln is a limited liability company organized under the laws of Maine with its

principal place of business in Lincoln, Maine.

## JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction over this action pursuant to FPA

Section 31(d)(3)(B), 16 U.S.C. § 823b(d)(3)(B).

16.    Following the Commission's July 17, 2012 issuance of an Order to Show Cause

and Notice of Proposed Penalty ("Order to Show Cause") under FPA Section 31(d)(1), 16 U.S.C.

§ 823b(d)(1), Lincoln elected the procedures of FPA Section 31(d)(3), 16 U.S.C. § 823b(d)(3),

pursuant to which the Commission may assess a civil penalty that, if unpaid, will be reviewed in

federal district court.  The Order to Show Cause, *Lincoln Paper and Tissue, LLC*, 140 FERC

¶ 61,031 (2012), and accompanying Enforcement Staff Report and Recommendation, is attached

as Exhibit 2 and incorporated by reference in this petition.

17.    Pursuant to Lincoln's election, and after considering Lincoln's response, the

Commission assessed a civil penalty as set forth in the Order Assessing Civil Penalty.  Because

Lincoln did not pay this penalty within 60 days, the statute requires the Commission to file an

enforcement action.  FPA Section 31(d)(3)(B), 16 U.S.C. § 823b(d)(3)(B) ("If the civil penalty

has not been paid within 60 calendar days after the assessment order has been made under

subparagraph (A), the Commission shall institute an action in the appropriate district court of the

United States for an order affirming the assessment of the civil penalty.").  Therefore, the

Commission now files this petition for an order from this Court affirming the assessment of the

civil penalty.  Under FPA Section 31(d)(3)(B), 16 U.S.C. § 823b(d)(3)(B), this Court "shall have authority to review de novo the law and the facts involved, and shall have jurisdiction to enter a judgment enforcing, modifying, and enforcing as so modified, or setting aside in whole or in Part" the Commission's assessment of the civil penalty.

18.     Venue properly lies within the District of Massachusetts pursuant to FPA Section 31(d)(3)(B), 16 U.S.C. § 823b, and Section 317, 16 U.S.C. § 825p, because portions of the acts or transactions constituting the violation occurred in Massachusetts.  Specifically, (1) Lincoln engaged in an unlawful scheme to fraudulently participate in the ISO-NE DALRP in and around New England, including in this District; (2) Lincoln communicated a false baseline to ISO-NE's Massachusetts headquarters; (3) Lincoln's claims for payment for phantom load reductions were received by ISO-NE in Massachusetts; (4) ISO-NE determined in Massachusetts that it should make those payments; (5) the unlawful scheme defrauded ISO-NE to the detriment of virtually all electricity customers in New England, including those in Massachusetts; and, (6) residents of this district were disproportionately harmed by Lincoln's conduct because the highest concentration of demand for electricity in New England is in Boston, Massachusetts.

## THE COMMISSION'S ANTI-MANIPULATION AUTHORITY

19.     In the wake of Enron Corporation's manipulative schemes in the western U.S. electricity markets, Congress, through the Energy Policy Act of 2005, amended the FPA to give the Commission broad authority to prohibit energy market manipulation.  In relevant part, FPA Section 222, 16 U.S.C. § 824v(a), makes it "unlawful for any entity . . . directly or indirectly, to use or employ, in connection with the purchase or sale of electric energy . . . any manipulative or deceptive device or contrivance . . . in contravention of such rules and regulations as the

Commission may prescribe as necessary and appropriate in the public interest or for the protection of electric ratepayers."

20.     The Commission implemented this statute in 2006 by promulgating the Anti-Manipulation Rule, which prohibits an entity from committing fraud by: (1) using a fraudulent device, scheme, or artifice, or making a material misrepresentation or a material omission as to which there is a duty to speak under a Commission-filed tariff, Commission order, rule, or regulation, or engaging in any act, practice, or course of business that operates or would operate as a fraud or deceit upon any entity; (2) with the requisite scienter; (3) in connection with the purchase or sale of electricity subject to the jurisdiction of the Commission.  18 C.F.R. § 1c.2 ("Anti-Manipulation Rule").  For purposes of this rule, "the Commission defines fraud generally, that is, to include any action, transaction, or conspiracy for the purpose of impairing, obstructing, or defeating a well-functioning market.  Fraud is a question of fact that is to be determined by all the circumstances of a case."  *Prohibition of Energy Market Manipulation*, Order No. 670, 114 FERC ¶ 61,047, at PP 49-50, *reh'g denied*, 114 FERC ¶ 61,300 (2006).

21.     The Energy Policy Act of 2005 also provided the Commission with increased civil penalty authority.  FPA Section 316A, 16 U.S.C. § 825o-1, authorizes the Commission to assess civil penalties against violators up to $1,000,000 for each day that a violation occurs.  The Commission has found that each separate transaction that constitutes a violation is subject to a $1,000,000 per day penalty.  Order Assessing Civil Penalty at PP 8 and 54.  In assessing penalties, the Commission must consider "the seriousness of the violation and the effort of such person to remedy the violation in a timely manner."  FPA Section 316A, 16 U.S.C. § 825o-1.

22.     In 2010, the Commission adopted Penalty Guidelines based on the corporate fine provisions of the U.S. Sentencing Guidelines in an effort to provide greater fairness,

transparency, and consistency in its civil penalty determinations. *Enforcement of Statutes, Orders, Rules, and Regulations*, 132 FERC ¶ 61,216 at PP 5-6 (2010) ("Revised Policy Statement on Penalty Guidelines."). The Commission relied on the Penalty Guidelines in determining the appropriate civil penalty to assess against Lincoln.

## BACKGROUND

23.     The Commission set forth in its Order Assessing Civil Penalty a detailed description of Lincoln's participation in the ISO-NE DALRP. *See* Order Assessing Civil Penalty at PP 10-13. In the Order Assessing Civil Penalty, the Commission concluded that Lincoln committed fraud, assessed a civil penalty of $5,000,000 that is consistent with the Penalty Guidelines, and ordered Lincoln to disgorge to ISO-NE $379,016.03, plus interest, in unjust profits.

### A.     ISO-NE's DALRP

24.     ISO-NE's DALRP is one of many demand response programs overseen by the Commission. Demand response can be defined as a "change[] in electric usage by end-use customers from their normal consumption patterns in response to changes in the price of electricity over time, or to incentive payments designed to induce lower electricity use at times of high wholesale market prices or when system reliability is jeopardized." *U.S. Department of Energy, Benefits of Demand Response in Electricity Markets and Recommendations for Achieving Them: A Report to the United States Congress Pursuant to Section 1252 of the Energy Policy Act of 2005* at 9 (Feb. 2006). Although there are different demand response programs, all of these programs require, at the least, either consumption of less electricity than normal or production of more electricity than normal.

25.     Simply stated, when a participant signs up for a demand response program such as the DALRP, it agrees that it will change its operations when the electric energy system operator requests load reductions.  And the only acceptable way to respond is through an actual change in behavior that results in the participant using less electricity from the grid than it uses when operating normally.

26.     In the case of the ISO-NE DALRP, this means that participants were offered the opportunity to be paid to use less electric energy than they normally used.  This could be accomplished many ways – for example, by running fewer factory lines, turning off lights, turning down air conditioning, or running an on-site generator at higher levels (and thereby taking less electricity off the grid).  Regardless of how this was done, it had to be done in a way that resulted in the participants actually reducing their demand for electric energy from the grid by using less electricity than they would have used but-for the demand response program.

27.     In order to accurately calculate the reduction in electricity consumption taken from the grid, ISO-NE first established a baseline for each demand response participant based on a five-day average of the participant's use of electricity from the grid when the participant was not offering to reduce its demand.  In other words, ISO-NE measured each participant's normal electric energy usage during a five-day period before the participant began reducing its demand.  Then, once the company began participating in the program, ISO-NE determined the participant's reduced demand by measuring the participant's actual metered load (measured consumption of electricity) during the hours in which ISO-NE accepted the participant's load reduction.  ISO-NE then subtracted the reduced demand from the participant's baseline demand to determine the participant's actual reduction in electricity usage and then compensated the participant for using less electricity from the grid when compared to the baseline.

28.     ISO-NE calculated the initial baseline by a simple average of hourly meter data for the peak period hours of 7:00 AM through 6:00 PM for electric energy taken from the grid for the initial five business days after the participant was approved for the DALRP.  Once an initial baseline was established, the baseline adjusted on a rolling basis using actual load data from the participant.  That way, if a participant's normal operations changed over time, the baseline would adjust to reflect the new normal operations and ensure the participant was not compensated for reducing electricity consumption that would have happened without the incentive provided by the DALRP.

29.     However, not all days were included in the rolling baseline calculation.  When a participant's DALRP offer was accepted for a given day, that day would be excluded from the rolling participant baseline.  Thus, if a participant offered into the DALRP every day, and those offers were accepted every day, the participant could maintain its initial baseline indefinitely.  The reason for excluding participation days from the rolling baseline is that the baseline was intended to represent the participant's normal operations absent participation in the DALRP.  Loads during demand response days are not typical because participants are reducing their electric energy usage on these days.

30.     DALRP participants could make offers to reduce their demand at a minimum price of $50/Megawatt/hour ("MWh") and a maximum price of $1,000/MWh.  Each offer had to be at least 100 kilowatts/hour ("kWh").  (A megawatt is 1000 kilowatts.)  Each day a participant would determine whether it had the flexibility to reduce its consumption of electric energy from the grid during the following day's peak period (7:00 AM to 6:00 PM).  If the participant could reduce its consumption, it would offer to reduce its use of electricity from the grid by a certain number of kilowatts or megawatts per hour during the peak period and at a certain price.  If the

participant made an offer to reduce electricity consumption at a price that was less than the price of electricity in the area during the following day's peak period, that offer would likely be accepted by ISO-NE and the participant would be compensated for reducing its consumption of electricity.

31.     DALRP participants offered to use less electricity (load reductions) for the next day from the hours of 7:00 AM through 6:00 PM on non-holiday weekdays and, if ISO-NE accepted the offer, the participant was obligated to reduce load the next day.  The participant's real-time electricity usage was measured against its baseline to quantify the load reduction.  As an example, in a given hour if a participant's baseline was 10 MW and actual electrical consumption from the grid was 7 MW, the calculated load reduction was 3 MW.

32.     Some load response participants, like Lincoln, participated in the DALRP with assistance from third-parties known as Enrolling Participants.  The Enrolling Participant registered the load response participant in the DALRP and arranged for ISO-NE to receive load response and meter data from the resource.  ISO-NE made DALRP payments to the Enrolling Participant, and the Enrolling Participant then distributed these revenues to the load response participant and any other entities based upon agreements among those parties.   In other words, Enrolling Participants are middlemen who facilitated communications between load response participants and ISO-NE regarding the DALRP.  Lincoln used Constellation NewEnergy Inc. ("Constellation") as its Enrolling Participant, and Constellation retained 15 percent of DALRP revenues in return for its work in this capacity.

**B.     Lincoln Paper Mill**

33.     Lincoln is a paper mill in Lincoln, Maine with approximately 400 employees.  In 2007, and when fully operational, the mill's electricity consumption was approximately 20 MW,

and did not fluctuate appreciably between day and night hours.   Lincoln obtained electricity in two ways: (1) by running generators on-site to produce approximately 4 MW and (2) by purchasing approximately 16 MW of electric energy from the grid.

34.     During the summer and early fall of 2007, Lincoln relied on a 4 MW steam-powered turbine generator that it used to create steam for manufacturing and to generate electricity ("the Westinghouse generator").

**C.     Lincoln's Participation in the DALRP**

35.     In July 2007, Lincoln enrolled in the DALRP with Constellation as its Enrolling Participant.

36.     Lincoln did not discuss setting its initial baseline with Constellation.

37.     Lincoln's initial five-day baseline was calculated based on its grid electric energy purchases between 7:00 AM and 6:00 PM on July 25, 26, 27, 30, and 31, 2007.

38.     Lincoln intentionally curtailed the Westinghouse generator to reduce its output of electricity by 3 MW from 7:00 AM to 6:00 PM each day during the baseline setting period. Therefore, instead of its typical energy usage mix of approximately 16 MW from the grid with the balance of energy obtained from 4 MW of on-site generation, Lincoln intentionally altered its energy usage mix during the baseline period to obtain nearly all its energy (19 MW) from the grid.  This created the illusion to ISO-NE that Lincoln normally purchased virtually all of its electric energy from the grid when, in fact, Lincoln normally purchased several megawatts less than that because it relied on its on-site generation to help power mill operations.

39.     Lincoln curtailed the Westinghouse generator shortly before 7:00 AM each day of the baseline period, and simultaneously increased its consumption of grid energy from approximately 16 MW to approximately 19 MW, where it would stay until 6:00 PM.   When the

DALRP hours ended at 6:00 PM, Lincoln restored the Westinghouse generator's output and Lincoln's consumption of electric energy from the grid dropped back down to its usual 16 MW. In other words, Lincoln changed its normal operations during only those hours its baseline was being measured. Lincoln purchased $10,000 of additional electric energy from the grid during the five days of the baseline period to offset the intentional reductions in electricity from the on-site Westinghouse generator.

40.     Lincoln normally would not have spent the additional $10,000 to purchase electricity because it was cheaper for Lincoln to use its Westinghouse generator to produce that amount of electric energy. Lincoln, in other words, engaged in what would have been economically irrational behavior during the baseline period by spending more for electricity than it needed during the 5-day baseline period. But it knew it could recoup its $10,000 losses, and obtain additional profit, from improper demand response payments once its participation in the DALRP began.

41.     Having created the false impression during the baseline period that it usually purchased virtually all of its electric energy from the grid, Lincoln acted to ensure that it could then be paid for running its generator as it normally did to support Lincoln's operations. This required ensuring that Lincoln's baseline continued to reflect its fraudulent ramping down of generation.

42.     Lincoln therefore engaged in a scheme to "freeze" its fraudulent baseline and ensure that it would continue to be paid for phantom load reductions. Lincoln realized that if it offered to "reduce" its grid electric energy purchases for the minimum allowed bid price, for every program hour of every day, its offers would almost always be accepted thereby preventing (or at least greatly limiting) its baseline from being recalculated.

43.     In July 2007 and August 2007 Lincoln verified with Constellation that its baseline would not change as long as its daily offers to "reduce" its grid electric energy purchases were accepted by ISO-NE.

44.     As Lincoln expected, its daily offers at the minimum price almost always cleared. This had the effect – as Lincoln planned – of preventing Lincoln's baseline from updating to reflect the use of its generator during normal operations.   Indeed, Lincoln's offers only failed to clear on a few occasions when Lincoln made a mistake, such as submitting its offer after the daily deadline to do so.

45.     Lincoln obtained DALRP revenues for almost every day it participated in the DALRP between August 1, 2007 and February 7, 2008.

46.     During the months of Lincoln's participation in the DALRP, Lincoln did not reduce its electricity consumption as the DALRP required.  Rather, Lincoln ran its generator as it normally did at all times other than during the baseline period.

47.     In November 2007, Lincoln compounded its fraud by attempting to replace the Westinghouse generator and transition to a new generator with an increased capacity of 13.5 MW ("the TG3 generator").  Lincoln began to use the new 13.5 MW TG3 generator to produce additional electric energy on site.   But because Lincoln had frozen its baseline through its offering scheme, the baseline did not adjust to reflect the new source of on-site generation that Lincoln was relying on for normal, daily operations.

48.     Lincoln's use of the TG3 generator reaffirms the conclusion that Lincoln intended to commit fraud.  Lincoln notified Constellation that it planned on adding the TG3 generator to produce additional electric energy on-site.  On November 29, 2007, Constellation advised

Lincoln via email that Lincoln's baseline should reflect the reduction of load drawn from the grid that such a generator would cause.

49.     On January 11, 2008, Constellation sent Lincoln a follow-up email asking if the new unit had begun operating, and if Lincoln was able to readjust its baseline in the DALRP to account for the new source of on-site generation.

50.     The Constellation employee who sent both emails later complained to supervisors that after sending multiple versions of the email, and making several phone calls, he was unable to get any response from Lincoln on the subject of the new generator.  Lincoln never responded to these emails or calls.  Instead, Lincoln brought the TG3 generator online, began using it to produce electricity, and claimed the newly-generated electricity as a "reduction" of Lincoln's energy consumption.

51.     In total, ISO-NE paid $445,901.21 to Lincoln and Constellation for Lincoln's participation in the DALRP between July 2007 and February 2008.  Approximately, 40 percent of these payments accrued in December and January – after Lincoln starting using the TG3 generator to generate additional electric energy on-site.

52.     Lincoln was paid 85 percent of the total amount, or $379,016.03; the remaining 15 percent was retained by Constellation as compensation for its work as Lincoln's Enrolling Participant.

53.     On January 23, 2008, Constellation sent Lincoln a letter, notifying Lincoln of Constellation's support for a new proposal by ISO-NE to modify DALRP bidding rules, by "increas[ing] the minimum bid required under the Day-Ahead Program, which will result in customers' bids clearing less frequently and their baselines being adjusted more regularly."

54.     Constellation was concerned that some of its customers might have been engaged in exactly what Lincoln was doing: artificially increasing the amount of energy purchased from the grid during the baseline period to create the illusion of reduced electric energy consumption when returning to normal operations.  As with the earlier emails and phone calls, Lincoln never responded to Constellation's letter.

55.     On February 8, 2008, ISO-NE changed the program to ensure that baseline inflation schemes, such as the one adopted by Lincoln, were no longer profitable.  After analysis of electricity usage data, ISO-NE suspected that Lincoln had committed fraud and referred the behavior to the Commission for possible enforcement action.

56.     During the period the scheme was in effect, Lincoln's behavior resulted in ISO-NE paying $445,901.21 for load response that did not occur.  Because ISO-NE passes through its demand response costs, consumers of electricity throughout New England were harmed.

**ENFORCEMENT'S INVESTIGATION OF LINCOLN**

57.     Enforcement commenced an investigation of Lincoln in February 2008.  During the investigation, Enforcement obtained and reviewed thousands of pages of documents.  The documents reviewed included emails, internal memoranda, records of Lincoln's actions related to the DALRP, and other relevant information.  Among other information, Enforcement analysts reviewed electricity consumption and load response offer data from Lincoln as well as from ISO-NE.  Enforcement attorneys also deposed Lincoln's President and CEO, Keith Van Scotter, Lincoln's Purchasing and Logistics Manager, and several third party witnesses (including Constellation employees).

58.     Enforcement determined from its investigation that Lincoln violated the Anti-Manipulation Rule when, as detailed in paragraphs 35 to 56, *supra*, it devised and implemented an unlawful scheme to inflate its baseline and receive compensation for demand response that it neither intended to provide nor actually provided.

59.     Lincoln is privately owned and has not traditionally made profit distributions to its owners.  From its inception in 2004 through 2008, Lincoln never disbursed profits.  Nevertheless, after becoming aware of Enforcement's investigation, Lincoln's owners made significant profit distributions to themselves in 2009 and 2010.

60.     Enforcement was unable to reach a settlement with Lincoln, and, consistent with Commission practice, issued a letter notifying Lincoln of Enforcement's intent to seek action by the Commission.  18 C.F.R. § 1b.19 (2013).  Lincoln provided a 103-page response to this letter, including attachments.  Lincoln's response, along with earlier staff correspondence with Lincoln detailing Enforcement's findings, was provided to the Commission.

61.     Enforcement, pursuant to Commission procedures, then provided its Staff Report and Recommendation to the Commission.  In the report, Enforcement detailed its findings and recommended the Commission issue an Order to Show Cause to Lincoln.

62.     On July 17, 2012, the Commission unanimously issued the Order to Show Cause to Lincoln, pursuant to FPA Section 31(d)(1), 16 U.S.C. § 823b(d)(1), attaching the Staff Report.  *Lincoln Paper and Tissue, LLC*, 140 FERC ¶ 61,031 (2012).  In the Order to Show Cause, the Commission ordered Lincoln to show cause why it should not be (1) found to have violated FPA Section 222, 16 U.S.C. § 824v, and the Anti-Manipulation Rule, (2) assessed a civil penalty of $4,400,000, and (3) required to disgorge $379,016.03 in unjust profits.

63.     The Order to Show Cause also required Lincoln to either proceed with an administrative hearing before an administrative law judge (subject to review by the United States Court of Appeals) pursuant to FPA Section 31(d)(2), 16 U.S.C. § 823b(d)(2) or, alternatively, to elect the procedures of FPA Section 31(d)(3)(B), 16 U.S.C. § 823b(d)(3)(B), pursuant to which the Commission may assess civil penalties without an administrative law judge hearing and then institute an action in federal district court to affirm the penalty assessment (if the subject fails to pay the penalty within 60 days of the Commission's order).  On August 14, 2012, Lincoln elected the procedures of FPA Section 31(d)(3)(B).

**AFTER REVIEW OF THE EVIDENCE, THE COMMISSION FOUND LINCOLN VIOLATED THE ANTI-MANIPULATION RULE**

64.     On September 14, 2012, Lincoln submitted a separate Answer to the Order to Show Cause.  On November 13, 2012, Enforcement filed a Reply in opposition to Lincoln's Answer.

65.     While Enforcement recommended the Commission issue an Order to Show Cause via the Staff Report, the staff who investigated this case did not advise the Commission in its deliberations.  The Commission's Separations of Functions Rule 2202, 18 C.F.R. § 385.2202 prohibits such investigative staff from participating in findings, conclusions, or decisions unless it is as a witness or counsel in public proceedings.

66.     The Commission reviewed the briefs and extensive documentary and testimonial record and on August 29, 2013, issued the Order Assessing Civil Penalties against Lincoln, unanimously finding that Lincoln violated FPA Section 222 and the Commission's Anti-Manipulation Rule from July 2007 to February 2008 by inflating and then maintaining a fraudulent baseline in order to receive payments for demand response that it neither intended to provide nor actually provided.  Order Assessing Civil Penalties at P 30.

67. The Commission explained its reasoning in detail, including an evaluation of the legal and factual defenses raised by Lincoln.

68. The Commission concluded that Lincoln violated the Anti-Manipulation Rule and that the violation was tolerated by senior level management. The Commission also determined that Lincoln did not cooperate with staff's investigation and provided delayed and incomplete responses to data requests. Due to Lincoln's lack of cooperation during the investigation, the Commission increased the $4,400,000 civil penalty recommended by staff in the Enforcement Report by $600,000 and assessed a civil penalty of $5,000,000.

69. The Commission found this penalty to be statutorily authorized under the FPA and appropriate in this case. Order Assessing Civil Penalties at PP 53-78.

70. The Commission further determined the $5,000,000 civil penalty assessment against Lincoln was within the penalty range provided by the Commission's Penalty Guidelines. *See* Revised Policy Statement on Penalty Guidelines, 132 FERC ¶ 61,216 (2010).

**A.     The Commission Found Lincoln Engaged in a Manipulative Scheme**

71. The Commission found that Lincoln's conduct constituted a fraudulent scheme or artifice, in violation of section 1c.2 of the Commission's regulations.

72. The Commission determined that Lincoln devised and implemented a scheme to inflate its baseline and obtain payment for demand response that it neither intended to provide nor actually provided.

73. The Commission found that Lincoln perpetuated its inflated baseline by knowingly and fraudulently exploiting a DALRP provision that prevented a participant's baseline from adjusting on days when ISO-NE accepted its offer to provide demand response.

74.     The Commission found that Lincoln's actions with respect to the DALRP defrauded ISO-NE at the expense of ratepayers throughout New England.  Lincoln's ongoing scheme caused electricity consumers in New England to pay $445,901.21 for demand response that never occurred, of which Lincoln received $379,016.03.

75.     The Commission also addressed and rejected Lincoln's defenses on this issue.

**B.      The Commission Found Lincoln Acted with Scienter**

76.     The Commission found that Lincoln acted with scienter when it engaged in its fraudulent scheme.  Lincoln demonstrated scienter by intentionally curtailing its generator during the initial baseline-setting period and submitting demand response bids almost every hour of every day during its participation in the DALRP.   During the baseline period, Lincoln purchased approximately $10,000 of grid electricity rather than generating that electricity using its own generator at a lower cost.

77.     The Commission found that there was no reason for Lincoln's conduct other than to inflate its baseline so that Lincoln could receive DALRP payments without having to reduce its consumption of electricity during hours the relevant bids were accepted.

78.     The Commission found that Lincoln understood the purpose of the baseline and how ISO-NE would calculate it.  The Commission found no evidence that Lincoln was confused about how to legitimately participate in the DALRP.  Even after receiving numerous communications from Constellation suggesting problems with how it participated in the DALRP, Lincoln remained silent.  Lincoln never notified Constellation or ISO-NE that it had curtailed its on-site generator during the initial baseline measurement period, was using on-site generation that was not reflected in the baseline, and was otherwise being paid for phantom load "reductions."

20

79.     The Commission also addressed and rejected Lincoln's defenses on this issue.

### C.     The Commission Found Lincoln's Manipulative Scheme Involved Jurisdictional Transactions

80.      The Commission found that Lincoln's fraudulent scheme was in connection with a jurisdictional transaction.  Section 205(a) of the FPA confers jurisdiction to the Commission over "[a]ll rates and charges made, demanded or received by any public utility for or in connection with the . . . sale of electric energy subject to the jurisdiction of the Commission, and all rules and regulations affecting or pertaining to such rates or charges."  16 U.S.C. § 824d(a) (2012).

81.     The Commission has jurisdiction over practices that directly or significantly affect rates under the FPA.  ISO-NE's markets are within the Commission's jurisdiction, as is ISO-NE's Commission-approved DALRP.

### CLAIM FOR RELIEF

(Against Lincoln for Violating FPA Section 222, 16 U.S.C. § 824v, and the Commission's Anti-Manipulation Rule, 18 C.F.R. § 1c.2)

82.     The Commission repeats each and every allegation set forth in Paragraphs 1 through 81, inclusive, as if set forth fully herein.

83.     Lincoln used or employed a fraudulent device, scheme, or artifice, or engaged in an act, practice, or course of business that operates or would operate as a fraud or deceit, with scienter, in connection with electric energy subject to the jurisdiction of the Commission in contravention of FPA Section 222, 16 U.S.C. § 824v, and the Commission's Anti-Manipulation Rule, 18 C.F.R. § 1c.2, promulgated to implement that section of the FPA.  Lincoln's manipulative scheme involved misrepresentations during the baseline period in July 2007, and each successive, daily communication to ISO-NE and Constellation of a willingness and ability to reduce electricity consumption from the grid.

84.     Accordingly, the Commission is entitled to an Order from this Court affirming its assessment of a civil penalty against Lincoln under FPA Section 31, 18 U.S.C. § 823b(d)(3)(B), requiring Lincoln to pay that penalty, and ordering Lincoln to disgorge its unjust profits, plus interest.

## JURY DEMAND

85.     Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Commission demands a trial by jury on all issues triable as such.

86.     Although the Commission has included a demand for a jury trial, the Commission respectfully submits that this Court can and should affirm the penalty assessment without modification following a review of the Order Assessing Civil Penalty and the materials presented to the Commission during the penalty assessment process.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court:

(A)     Enter an order and judgment affirming the Commission's assessment of a $5,000,000 civil penalty against Lincoln and ordering Lincoln to pay that penalty;

(B)     Enter an order requiring Lincoln to disgorge the unjust profits of $379,016.03, plus interest, it obtained as a result of its illegal manipulative scheme; and

(C)     Order such other and further relief as may be necessary and appropriate.


Respectfully submitted,

FEDERAL ENERGY REGULATORY COMMISSION

NORMAN C. BAY
Director
Office of Enforcement

LARRY  D. GASTEIGER
Deputy Director
Office of Enforcement

LARRY PARKINSON
Director
Division of Investigations

DAVID APPLEBAUM
Deputy Director
Division of Investigations


*/s/ Nicole L. Brisker*
NICOLE L. BRISKER
DEMETRA ANAS
GABRIEL S. STERLING III
MICHAEL RAIBMAN
SUSAN BEALL
Attorneys
Division of Investigations
Office of Enforcement
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, DC  20426
(202) 502-6248
Nicole.Brisker@ferc.gov

*Of Counsel*

Christopher R. Donato
Assistant U.S. Attorney
John Joseph Moakley Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02110
(617) 748-3303
Chris.Donato@usdoj.gov


Dated:  December 2, 2013