UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FEDERAL ENERGY REGULATORY
COMMISSION,

                  Petitioner,

      v.

LINCOLN PAPER AND TISSUE, LLC,

                  Respondent.

Case No. 1:13-CV-13056-DPW

**LEAVE TO FILE REQUESTED ON 2/14/14**

**<u>LINCOLN PAPER AND TISSUE, LLC'S MEMORANDUM
OF LAW IN SUPPORT OF MOTION TO DISMISS COMPLAINT</u>**

Dated: February 14, 2014

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF FACTS ...................................................................................... 6

I.   THE PARTIES AND ISO-NE ...................................................................... 6

    A.   FERC ................................................................................................. 6

    B.   Lincoln .............................................................................................. 7

    C.   ISO-NE .............................................................................................. 8

II.  DEMAND RESPONSE AND THE INITIAL ISO-NE DALRP RULES ........... 8

    A.   Demand Response ............................................................................. 8

    B.   DALRP ............................................................................................. 9

    C.   The Initial DALRP Rules ................................................................ 10

III. LINCOLN'S PARTICIPATION IN DALRP ................................................ 11

IV.  SUBSEQUENT CHANGES AND CLARIFICATIONS OF THE DALRP RULES ....... 12

V.   FERC'S INVESTIGATION AND ALLEGATIONS ........................................ 13

ARGUMENT ...................................................................................................... 15

I.   FERC'S CLAIM FOR CIVIL PENALTIES IS BARRED BY THE FIVE-YEAR
     STATUTE OF LIMITATIONS IN SECTION 2462 ........................................ 15

    A.   The Supreme Court Recently Held That Section 2462 Bars An Action To
          Enforce A Civil Penalty Filed More Than Five Years After The Violation ....... 15

    B.   The "Additional" Limitations Period Found In *Meyer* Does Not Apply
          Here Because There Has Not Been An "Adjudicatory Proceeding" Below ........ 16

II.  FERC LACKS JURISDICTION OVER LINCOLN'S CONDUCT ................... 19

    1.   FERC Has Jurisdiction Over Wholesale Sales of Electricity,
          But Not Over Demand Response, Which Is a Retail Non-
          Purchase ......................................................................................... 20

    2.   FERC Cannot Exercise Jurisdiction Over Demand Response
          As a Practice "Affecting or Pertaining to" Wholesale Rates ................. 21

III.   FERC FAILED TO PROVIDE FAIR NOTICE OF THE CONDUCT IT NOW
       CONSIDERS IMPROPER ............................................................................................. 22

       A.    The Fair Notice Doctrine ................................................................................... 22

       B.    DALRP Rules Did Not Provide Fair Notice Because They Were Silent
             Regarding How To Set A "Baseline".................................................................. 25

       C.    FERC Seeks to Penalize Lincoln Based on an Interpretation First
             Announced in an Administrative Proceeding ...................................................... 26

       D.    FERC's Standardless Interpretation of its Rules Authorizes Arbitrary and
             Discriminatory Enforcement .............................................................................. 28

IV.    THE COMPLAINT FAILS TO PLEAD ITS CLAIM WITH PARTICULARITY .......... 29

       A.    The Heightened Pleading Standards for Fraud ................................................... 29

       B.    FERC Fails to Plead a Scheme to Defraud With Particularity............................. 30

       C.    FERC Fails to Adequately Plead that Lincoln Acted with *Scienter* ................... 32

       D.    FERC Fails to Adequately Plead That Lincoln's Conduct Was in
             Connection With a FERC-Jurisdictional Transaction.......................................... 35

CONCLUSION..................................................................................................................... 36

# TABLE OF AUTHORITIES

**Pages(s)**

## CASES

*Altamont Gas Transmission Co. v. FERC*,
  92 F.3d 1239 (D.C. Cir. 1996) ............................................................. 22

*Arruda v. Sears, Roebuck & Co.*,
  310 F.3d 13 (1st Cir. 2002) ................................................................. 30

*Ashcroft* v. *Iqbal*,
  556 U.S. 662 (2009) ............................................................................ 30

*Atl. City Elec. Co. v. FERC*,
  295 F.3d 1 (D.C. Cir. 2002) ................................................................ 20

*Aulson v. Blanchard*,
  83 F.3d 1 (1st Cir. 1996) ..................................................................... 30

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) ............................................................................ 34

*Beaver Plant Operations v. Herman*,
  223 F.3d 25 (1st Cir. 2000) ................................................................. 28

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ...................................................................... 5, 30

*Brady v. Maryland*,
  373 U.S. 83 (1963) .............................................................................. 16

*CFTC v. Reisinger*,
  2013 WL 3791691 (N.D. Ill. July 18, 2013) ...................................... 16

*Chicago v. Morales*,
  527 U.S. 41 (1999) .............................................................................. 29

*Christopher v. SmithKline Beecham Corp.*,
  132 S. Ct. 2156 (2012) ........................................................................ 24

*Coates v. Cincinatti*,
  402 U.S. 611 (1971) ............................................................................ 27

*Coyne v. Metabolix, Inc.*,
  943 F. Supp. 2d 259 (D. Mass. 2013) ................................................. 33

*Dennis v. United States*,
  384 U.S. 855 (1966) ............................................................................ 29

*Diamond Roofing Co. v. OSHRC*,
  528 F.2d 645 (5th Cir. 1976) .............................................................. 23

*Drabik v. Stanley-Bostich, Inc.*,
  997 F.2d 496 (8th Cir. 1993) ................................................................ 27

*Elec. Power Supply Ass'n v. FERC*,
  Nos. 11-1486, *et al.* (D.C. Cir. Dec. 23, 2011) ............................... 9, 20

*Elgin Nursing & Rehabilitation Center v. HHS*,
  718 F.3d 488 (D.C. Cir. 2013) ........................................................ 5, 29

*Ernst & Ernst v. Hochfelder*,
  425 U.S. 185 (1976) .............................................................................. 32

*Fabi Constr. Co. v. Sec'y of Labor*,
  508 F.3d 1077 (D.C. Cir. 2007) ............................................................ 23

*FCC v. Fox Television Stations, Inc.*,
  132 S. Ct. 2307 (2012) ...................................................................... 3, 22

*FEC v. Nat'l Republican Senatorial Comm.*,
  877 F. Supp. 15 (D.D.C. 1995) ............................................................. 18

*FPC v. Conway Corp.*,
  426 U.S. 271 (1976) .............................................................................. 21

*FPC v. S. Cal. Edison Co.*,
  376 U.S. 205 (1964) .......................................................................... 3, 20

*Gabelli v. SEC*,
  133 S. Ct. 1216 (2013) ........................................................ 1, 2, 15, 16, 18

*Gates & Fox Co., Inc. v. OSHA*,
  790 F.2d 154 (D.C. Cir. 1996) ............................................................. 24

*Gen. Elec. Co. v. EPA*,
  53 F.3d 1324 (D.C. Cir. 1995) ................................... 3, 4, 22, 23, 24, 28

*Greebel v. FTP Software, Inc.*,
  194 F.3d 185 (1st Cir. 1999) ................................................................ 33

*Greenstone v. Cambex Corp.*,
  975 F.2d 22 (1st Cir. 1992) ............................................................. 30, 33

*Helwig v. Vencor, Inc.*,
  251 F.3d 540 (6th Cir. 2001) ............................................................... 33

*In re First Marblehead Corp. Sec. Litig.*,
  639 F. Supp. 2d 145, 153 (D. Mass. 2009) ........................................... 30

*In re Goodyear Tire & Rubber Co. Sec. Litig.*,
  436 F. Supp. 2d 873 (N.D. Ohio 2006) ................................................. 33

*New York v. FERC*,
  535 U.S. 1, 20 (2002) ........................................................................... 20

*Ohio Bell Tel. Co. v. Pub. Utils. Comm'n of Ohio*,
  301 U.S. 292 (1937) ............................................................................... 3

*Pub. Util. Dist. No. 1 of Snohomish Cnty., Washington v. FERC*,
   272 F.3d 607 (D.C. Cir. 2001) ................................................................. 7

*Radio Athens, Inc. v. FCC*,
   401 F.2d 398 (D.C. Cir. 1968) ............................................................... 23

*Richmond Power & Light v. FERC*,
   574 F.2d 610 (D.C. Cir. 1978) ............................................................... 22

*Satellite Broadcasting Co. v. FCC*,
   824 F.2d 1 (D.C. Cir. 1987) ................................................... 23, 24, 28

*SEC v. Durgarian*,
   477 F. Supp. 2d 342 (D. Mass. 2007) ................................................. 32

*Trinity Broad. v. FCC*,
   211 F.3d 618, 629-30 ............................................................................. 27

*United States v. Lachman*,
   278 F. Supp. 2d 68 (D. Mass. 2003) .............................................. 23, 27, 29

*United States v. Lachman*,
   387 F.3d 42 (1st. Cir. 2004) .................................................................. 23

*United States v. Meyer*,
   808 F.2d 912 (1st Cir. 1987) ................................................... 16, 17, 19

*United States v. Midwest Generation, LLC*,
   720 F.3d 644 (7th Cir. 2013) ................................................................ 16

*Upton v. SEC*,
   75 F.3d 92 (2d Cir. 1996) ...................................................................... 28

*West Ohio Gas Co. v. Public Utils. Comm'n*,
   294 U.S. 63 (1935) .................................................................................... 3

## FERC ORDERS

*Barclays Bank, PLC*,
   143 FERC ¶ 61,024 (2013) ..................................................................... 21

*Demand Response Compensation in Organized Wholesale Energy Markets*,
   Order No. 745, 134 FERC ¶ 61,187 (2011), *reh'g denied*, 137 FERC ¶ 61,215 (2011),
   *reh'g denied*, 138 FERC ¶ 61,148 (2012) .......................................... 9, 21

*Energy Spectrum, Inc. v. New York Indep. Sys. Operator, Inc.*,
   141 FERC ¶ 61,197 (2012) ..................................................................... 29

*EnergyConnect, Inc.*,
   130 FERC ¶ 61,031 (2010) ..................................................................... 21

*EnerNOC*,
   134 FERC ¶ 61,158 (2011) ..................................................................... 29

*Enforcement of Statutes, Regulations, and Orders*,
   129 FERC ¶ 61,248 (2009) ..................................................................... 16

*ISO New England, Inc.*,
   138 FERC ¶ 61,042 (2012), *reh'g denied*, 139 FERC ¶ 61,116 (2012) .................................. 13

*ISO New England, Inc.*,
   123 FERC ¶ 61,021 (2008) ("April 2008 Order"), *reh'g denied*, 124  FERC ¶ 61,235
   (2008) ("September 2008 Order").......................................................................... 4, 12, 13, 26

*Neptune Reg'l Transmission Sys. LLC*,
   111 FERC ¶ 61,455 (2005) ............................................................................................ 24

*New England Power Pool and ISO New England, Inc.*,
   100 FERC ¶ 61,287 ("September 2002 Order"), *on reh'g and compliance,* 101 FERC
   ¶ 61,344 (2002) ("December 2002 Order") ................................................................... 9

*Nw. Pipeline Corp.*,
   109 FERC ¶ 61,356 (2004) ............................................................................................ 24

*Prohibition of Energy Market Manipulation*,
   Order No. 670, 114 FERC ¶ 61,047 (2006)......................................................... 15, 29, 34

*Regional Transmission Organizations*,
   Order No. 2000, 89 FERC ¶ 61,285 (1999), *order on reh'g*, 90 FERC ¶ 61,201 (2000) .......... 6

*Submissions to the Commission upon Staff Intention to Seek an Order to Show Cause*,
   Order No. 711, 123 FERC ¶ 61,159 (2008)................................................................. 16

*Tres Palacio Gas Storage LLC*,
   126 FERC ¶ 61,167 (2009).............................................................................................. 24

*Wholesale Competition in Regions with Organized Electric Markets*,
   Order No. 719, 125 FERC ¶ 61,071 (2008), *order on reh'g*, 128 FERC ¶ 61,059
   (2003), *reh'g denied*, 129 FERC ¶ 61,252 (2009) ...................................................... 8

## STATUTES

17 C.F.R. § 201.230(a)(1) ................................................................................................ 16

17 C.F.R. § 202.5 ............................................................................................................ 16

18 C.F.R. § 1c.2 .......................................................................................................... 1, 30

18 C.F.R. § 35.28(b)(4).............................................................................................. 8, 20

Fed. R. Civ. P. 9(b) .................................................................................................. 1, 5, 30

## Federal Power Act (FPA)

16 U.S.C. § 823b(d) ......................................................................................................... 2

16 U.S.C. § 824(a) ................................................................................................ 3, 6, 20, 21

16 U.S.C. § 824(b)(1) .................................................................................................. 6, 20

16 U.S.C. § 824d .......................................................................................................... 8, 21

16 U.S.C. § 824v.......................................................................................................... 1, 30

**Judiciary and Judicial Procedure**

28 U.S.C. § 2462 ............................................................................................................... 1, 15

### OTHER AUTHORITIES

ISO New England Manual for Market Operations, Manual M-11 ("Energy Market")
    (Revision 47) (effective date Oct. 6, 2013), *available at:*
    www.isonewengland.com/rules_proceds/isone_mnls/m_11_market_operations_revisio
    n_47_10_06_13.doc ............................................................................................................ 8

U.S. Dept. of Energy, *Benefits of Demand Response in Electricity Markets and
    Recommendations for Achieving Them:  A Report to the United States Congress
    Pursuant to Section 1252 of the Energy Policy Act of 2005* at 9 (Feb. 2006) ("2006
    DOE Report") ...................................................................................................................... 8

Whit Richardson, *Lincoln paper mill layoffs due to contract lost to Indonesian firm, not
    just boiler explosion*, BANGOR DAILY NEWS, Dec. 17, 2013, *available at*
    https://bangordailynews.com/2013/12/17/business/lincoln-paper-mill-layoffs-due-to-
    contract-lost-to-indonesian-firm-not-just-boiler-explosion ......................................................... 7

## PRELIMINARY STATEMENT

FERC's December 2013 complaint (the "Complaint") should be dismissed because it is time barred.  Under 28 U.S.C. § 2462 ("Section 2462") and the Supreme Court's recent decision in *Gabelli v. SEC*, 133 S. Ct. 1216, 1221-22 (2013), the Federal Energy Regulatory Commission ("FERC" or the "Commission") must have brought this action to enforce the civil penalty it seeks to impose on defendant Lincoln Paper and Tissue, LLC ("Lincoln") by February 7, 2013, *i.e.*, within five years after the date of the last violation alleged by FERC.  Even if the statute of limitations had not run, this case must be dismissed because FERC lacks jurisdiction over the conduct at issue, because Lincoln was not put on "fair notice" that its conduct was improper, and because FERC's claim sounding in fraud has not been pled with the specificity required by Rule 9(b) of the Federal Rules of Civil Procedure ("FRCP").

FERC alleges that Lincoln, a small paper mill located in Maine and unsophisticated in the energy markets, engaged in a manipulative "scheme" to receive "additional profit" from its participation in a then-novel "demand response" program called the Day-Ahead Load Response Program ("DALRP").  That nascent program was, and still is, administered by ISO New England, Inc. ("ISO-NE"), an independent, non-profit "regional transmission organization" ("RTO") regulated by FERC.  Demand response programs are designed to encourage retail customers like Lincoln to reduce their consumption of electricity in response to incentives. FERC alleges that Lincoln fraudulently participated in DALRP from July 2007 to February 2008, in violation of Section 222 ("Section 222") of the Federal Power Act ("FPA"), 16 U.S.C. § 824v, and FERC's Anti-Manipulation Rule, 18 C.F.R. § 1c.2.  Compl. at ¶ 10.

FERC's non-public investigation of Lincoln started *more than six years ago* and culminated in FERC assessing a $5 million civil penalty against Lincoln in its August 29, 2013 "Order Assessing Civil Penalty."  During the investigation and proceeding before FERC, there

was no "adjudication" of Lincoln's liability in an adversarial proceeding before a neutral trier of fact:  Lincoln did not have a hearing before an administrative law judge ("ALJ"), nor did it have the right to take or receive discovery (or to even know who the witnesses against it were or what they said) or to appeal FERC's findings.  Instead, FERC acted as prosecutor, judge, and jury, and now seeks to prevent Lincoln from ever having the claims against it fairly adjudicated.  Despite FERC's six-year investigation, it has not pled any facts demonstrating that Lincoln engaged in fraudulent acts at all, and certainly not in connection with FERC-jurisdictional wholesale energy sales.  Further, FERC did not provide "fair notice" that the complained-of actions were improper.

**This action is time barred.**  Under the recent Supreme Court ruling in *Gabelli,* a claim for civil penalties is governed by the five-year statute of limitations in Section 2462 that begins to run at the time of the alleged violation.  Lincoln's last alleged violation occurred on February 7, 2008.  This required FERC to file its Complaint by February 7, 2013.  Its December 2013 Complaint is therefore time barred.  FERC may argue (as it recently has in another case before this Court) that there is an *additional* five-year limitations period that applies.  But the First Circuit case that adopted that rule does not apply here.  That case emphasized that an additional limitations period applies *only* where an agency, unlike here, engages in an "adjudicatory hearing" before an ALJ, governed by the Administrative Procedures Act ("APA"), where the respondent has "*a full panoply of discovery*" rights and the right to appeal.  Lincoln had none of those things in the FERC proceeding below.[1]

---

[1]   FERC takes the position that the Court should rubber-stamp FERC's determination of Lincoln's liability, based solely on FERC's findings and materials discussed in FERC's Penalty Assessment Order.  Compl. at ¶ 86.  In that case, Lincoln would *never* have an opportunity to litigate the merits of FERC's claim in an adversarial proceeding, and neither Lincoln nor this Court would ever learn the full factual basis for FERC's claim or any exculpatory evidence FERC's investigation uncovered.  Section 31(d) of the FPA, 16 U.S.C. § 823b(d), grants the target of a FERC enforcement action the right to have its liability adjudicated *either* before a FERC ALJ *or* a United States District Court that is to review *de novo* all matters of fact and law.  Yet FERC would have the

[Footnote continued on next page]

**FERC lacks jurisdiction over Lincoln's participation in the DALRP.**  The FPA grants FERC jurisdiction over "the sale of [electric] energy at wholesale in interstate commerce," but forbids FERC from regulating retail sales, which are "subject to regulation by the States."  16 U.S.C. § 824(a).  The Complaint concerns Lincoln's provision of "demand response" by reducing its consumption, *i.e.*, by electing to forego *retail* purchases, in response to incentive payments from ISO-NE.  *Retail non-purchases* are the opposite of FERC-jurisdictional *wholesale sales*.  FERC has asserted that it has jurisdiction over such retail non-purchases because, in its view, demand response is a service that "affect[s] or pertain[s] to" FERC-jurisdictional wholesale rates (*i.e.*, by reducing demand, these programs reduce wholesale prices).  Compl. at ¶ 80.  This argument is misguided and should be rejected.  Retail rate setting is exclusively "subject to regulation by the States."  16 U.S.C. § 824(a).  FERC's argument obliterates the "bright line" distinction "between federal and state jurisdiction" that Congress made in enacting the FPA.  *FPC v. S. Cal. Edison Co.*, 376 U.S. 205, 215-16 (1964).

**Lincoln did not have fair notice that FERC considered Lincoln's actions improper.**  The Due Process Clause of the Fifth Amendment "requires that parties receive fair notice before being deprived of property," *Gen. Elec. Co. v. EPA*, 53 F.3d 1324, 1328 (D.C. Cir. 1995), and agencies must give sufficient guidance such that "a person of ordinary intelligence [has] fair notice of what is prohibited," and "so that those enforcing the law do not act in an arbitrary or discriminatory way."  *FCC v. Fox Television Stations, Inc.,* 132 S. Ct. 2307, 2317 (2012).

---

[Footnote continued from previous page]

Court order Lincoln to pay a $5 million civil penalty without *any* discovery, hearing, or trial.  As the Supreme Court has held, a reviewing court cannot simply "take the word of the Commission as to the outcome of a secret investigation, and let it go at that.  'A hearing is not judicial, at least in any adequate sense, unless the evidence can be known.'"  *Ohio Bell Tel. Co. v. Pub. Utils. Comm'n of Ohio*, 301 U.S. 292, 304 (1937) (quoting *West Ohio Gas Co. v. Pub. Utils. Comm'n*, 294 U.S. 63, 69 (1935).

Where an agency seeks to penalize a party based on a novel interpretation of its regulations that is announced for the first time in an administrative proceeding and that was not clear from the regulation and previous guidance, then that "party is not 'on notice' of the agency's ultimate interpretation," and therefore "may not be punished." *Gen. Elec.*, 53 F.3d at 1333-34.  Such is the case here.

FERC alleges Lincoln engaged in fraud by "curtailing" its behind-the-meter generator ("BTMG") and thereby setting a "false baseline to create the illusion that it was reducing consumption" in order to "extract payments for phantom load reductions."  Compl. at ¶ 10.  But the ISO-NE baseline-setting rules in effect at the time consisted of short, mechanical formulas that were *silent* as to how a customer should set its baseline or operate its BTMG when doing so. Indeed, *FERC's Commissioners* recognized that those rules were vague and left "unresolved the fundamental problem as to how an individual customer's baseline load should be determined..." *See, e.g., ISO New England, Inc.*, 123 FERC ¶ 61,021 at 61,105-06 (2008) ("April 2008 Order") (Wellinghoff, Comm'r, dissenting in part), *reh'g denied*, 124 FERC ¶ 61,235 (2008) ("September 2008 Order").  Moreover, FERC has not alleged that Lincoln violated any specific provision of ISO-NE's rules or pointed to any public statement or document issued by FERC or ISO-NE that put sophisticated energy market participants, much less an unsophisticated entity like Lincoln, on notice that such a method of baseline setting was improper.  Nor could FERC allege that it was because setting a baseline in the way Lincoln did *was not prohibited at the time*.  The approach Lincoln used was a reasonable reading of the rules, was consistent with industry practice, and was in accord with its view that it was already providing demand response before it began participating in DALRP, that DALRP was an incentive to continue to do so, and that its BTMG was unreliable.

FERC's allegation that Lincoln violated FERC's Anti-Manipulation Rule is based on a novel interpretation that stretches the rule to cover lawful, non-fraudulent conduct like Lincoln's. This Court should not defer to FERC's overbroad interpretation of this vague regulation, both because Section 31(d)(3)(B) of the FPA provides that this Court is to review *de novo* all issues of fact and law and because it would impermissibly allow FERC "to function not only as judge, jury, and executioner but to do so while crafting new rules." *Elgin Nursing & Rehabilitation Center v. HHS*, 718 F.3d 488, 494 (D.C. Cir. 2013).

**The Complaint fails to plead its Section 222 claim with the requisite specificity**. The Complaint is riddled with naked assertions and conclusory statements. Once those statements are cast aside, the Complaint fails to allege a claim that is plausible, rather than speculative, as required under *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007), and it fails to plead its Section 222 claim with the necessary "particularity" required by FRCP Rule 9(b). Indeed, FERC has not (and cannot) properly plead any of the elements of a Section 222 claim.

*First*, FERC fails to adequately plead that Lincoln engaged in a "fraudulent or manipulative scheme." FERC alleges only that Lincoln curtailed its generator when setting a baseline for participation in DALRP and simply *concludes* this was not permitted. This conclusion is the basis for FERC's declaration that Lincoln's conduct was fraudulent. But, FERC does not plead *any* facts indicating Lincoln's baseline was actually *false*, nor cite to *any* FERC or ISO-NE rule indicating that Lincoln's conduct was improper. Nor could it. The rules in effect at that time were silent as to how BTMG should be run when setting the baseline, and did not prohibit setting the baseline in the manner in which the Complaint alleges Lincoln did.

*Second*, FERC fails to adequately plead that Lincoln acted with *scienter*. FERC merely concludes that, because Lincoln set its baseline in a manner FERC now disapproves of, Lincoln

must have had *scienter*.  But FERC fails to allege facts demonstrating that Lincoln possessed the requisite *scienter*.  FERC even fails to allege facts from which one could infer *scienter,* much less reach a "strong inference" of *scienter*.  Indeed, aside from conclusory allegations, FERC fails to plead any facts from which one could infer that Lincoln was aware that its baseline was set incorrectly, much less that it intended to defraud anyone.

*Third*, FERC fails to properly plead that it has jurisdiction over Lincoln.  Here again, FERC simply asserts that this element is met.  But FERC has not alleged any facts demonstrating that Lincoln's retail non-purchases were subject to FERC's jurisdiction over wholesale energy sales or were otherwise in connection with a FERC-jurisdictional transaction.

## STATEMENT OF FACTS

### I.    THE PARTIES AND ISO-NE

#### A.    FERC

FERC is an administrative agency of the United States, organized and existing pursuant to the FPA.  Compl. at ¶ 13.  The FPA grants FERC jurisdiction over "transmission of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce," 16 U.S.C. § 824(a), but forbids FERC from regulating "any other sale of electric energy," 16 U.S.C. § 824(b)(1), including transactions "subject to regulation by the States."  16 U.S.C. § 824(a).  Over the past 15 years, FERC has encouraged electric utilities to transfer control over their transmission facilities to independent public utility entities that are referred to as independent system operators ("ISOs") and RTOs, which are responsible for operating member utilities' transmission systems and administering organized markets for wholesale electricity.[2]

---

[2]   *See generally Regional Transmission Organizations*, Order No. 2000, 89 FERC ¶ 61,285 (1999) (FERC order establishing criteria for certification as an RTO), *order on reh'g*, Order No. 2000-A, 90 FERC ¶ 61,201 (2000),

[Footnote continued on next page]

### B.     Lincoln

Lincoln is a small limited liability company that owns and operates a paper mill in Lincoln, Maine (the "Mill").   Compl. at ¶ 14.   During the relevant period, the Mill had approximately 400 employees.  *See id.* at ¶ 33.[3]   The Mill operates a large and complex manufacturing facility seven days a week and 24 hours a day to fill customer orders.

Lincoln is not, and the Complaint does not allege that it is, a sophisticated energy market participant or a wholesale energy customer.  *See generally*, Ex. 2 at 32-33 [Lincoln's Answer in Opposition to Order to Show Cause (Sept. 14, 2012)].   Instead, Lincoln is a retail customer that consumes the electricity that it purchases.   During the relevant period, Lincoln supplied part of its own energy or "load" through two on-site, BTMGs: (1) an old and unreliable Westinghouse generator with a capacity of 4 MW (the "Westinghouse"), which provided both electricity and steam management for the plant's manufacturing process; and (2) a TG3 Fincantieri generator (the "TG3") with a nameplate capacity of 13.5 MW, which was intended to replace the Westinghouse, began operational testing in November 2007, and commenced commercial operations in January 2008 (*i.e.*, after Lincoln began participating in the DALRP).  Compl., Ex. 1 [Penalty Assessment Order] at P 15.[4]   Lincoln purchased the remainder (and most) of its

---

[Footnote continued from previous page]

*aff'd sub nom. Pub. Util. Dist. No. 1 of Snohomish Cnty., Washington v. FERC*, 272 F.3d 607 (D.C. Cir. 2001).

[3]   In November 2013, shortly before FERC filed its Complaint, Lincoln was forced to lay off approximately 200 millworkers, nearly half of its work force, following an explosion on November 2, 2013 that destroyed a recovery boiler at the mill and the subsequent (though unrelated) loss of a major customer.  *See* Ex. 1 [Whit Richardson, *Lincoln paper mill layoffs due to contract lost to Indonesian firm, not just boiler explosion*, BANGOR DAILY NEWS, Dec. 17, 2013, *available at* https://bangordailynews.com/2013/12/17/business/lincoln-paper-mill-layoffs-due-to-contract-lost-to-indonesian-firm-not-just-boiler-explosion].

References to "Ex. __" are to exhibits to the concurrently filed Declaration of William S. Scherman, Esq. in Support of Lincoln Paper and Tissue, LLC's Memorandum of Law in Support of Motion to Dismiss Complaint, dated February 14, 2014.

[4]   Standard FERC practice is to cite to paragraphs (denoted with a "P") rather than page numbers of FERC orders.

electricity at retail from Constellation NewEnergy, Inc. ("Constellation").  *Id.* at P 14.

### C.      ISO-NE

ISO-NE is an independent, non-profit RTO created by FERC in 1997.  ISO-NE operates

the FERC-jurisdictional transmission system and administers the FERC-jurisdictional wholesale

power markets in the New England area, Compl. at ¶ 2, in which power is sold at the rates, terms

and conditions reviewed and authorized by FERC.  16 U.S.C. § 824d.  In these markets, ISO-NE

accepts offers to sell energy in ascending price order until the full demand for energy has been

met at a "market-clearing price" that is determined for each pricing zone on the ISO-NE

transmission system, and that is referred to as the "locational marginal price" (or "LMP").[5]

## II.      DEMAND RESPONSE AND THE INITIAL ISO-NE DALRP RULES

### A.      Demand Response

FERC's regulations define "demand response" as "a reduction in the consumption of

electric energy by customers from their expected consumption in response to an increase in the

price of electric energy or to incentive payments designed to induce lower consumption of

electric energy."  18 C.F.R. § 35.28(b)(4).[6]  In plain English, "demand response" refers to the

basic economic principle that, when electricity prices go up, customers demand less of it, and

this reduction in demand should in turn lower prices.  Due to the division between FERC and

---

[5]   *See generally* ISO New England Manual for Market Operations, Manual M-11, Section 2 ("Energy Market") (Revision 47) (effective date Oct. 6, 2013), *available at:* www.isonewengland.com/rules_proceds/isone_mnls/m_11_market_operations_revision_47_10_06_13.doc.

[6]   FERC adopted the definition of "demand response" in an order issued in October 2008 (*i.e.*, after the relevant time period addressed in the Complaint).  *See Wholesale Competition in Regions with Organized Electric Markets,* Order No. 719, 125 FERC ¶ 61,071 (2008), *order on reh'g,* Order No. 719-A, 128 FERC ¶ 61,059 (2003), *reh'g denied,* Order No. 719-B, 129 FERC ¶ 61,252 (2009).  In the Complaint, however, FERC does not cite any definition in FERC's regulations or ISO-NE's DALRP rules, and instead relies on a definition in a 2006 Department of Energy ("DOE") report.  *See* Compl. at ¶ 24 (citing U.S. Dept. of Energy, *Benefits of Demand Response in Electricity Markets and Recommendations for Achieving Them:  A Report to the United States Congress Pursuant to Section 1252 of the Energy Policy Act of 2005* at 9 (Feb. 2006) ("2006 DOE Report")).

state jurisdiction over wholesale and retail transactions, however, there is a disconnect between wholesale rates, which vary greatly in real time, and retail rates, which generally do not vary in response to changes in wholesale prices.[7]  As a result, State-jurisdictional retail consumers do not "see" FERC-jurisdictional wholesale prices, and thus do not receive clear price signals as to when it would be beneficial for them to reduce consumption.   To address this disconnect, demand response programs have been implemented to incentivize retail customers to reduce consumption.  *See*, *e.g.*, Order No. 745 at P 13.

### B.   DALRP

FERC authorized DALRP in 2002 as part of an ISO-NE proposal to establish various demand response programs.[8]   ISO-NE did not provide any definition of the term "demand response," but it explained that the purpose of such programs is to reduce energy prices (*i.e.*, the LMP).   *See* Ex. 5 at 6 [ISO-NE Changes to DALRP FERC Filing (Feb. 5, 2008)].   DALRP worked as follows:  retail customers participating in the program would "submit price bids that

---

[7]   *See Demand Response Compensation in Organized Wholesale Energy Markets*, Order No. 745, 134 FERC ¶ 61,187 at P 57 (2011) ("Order No. 745") (codified in 18 C.F.R. § 35.28), *reh'g denied*, Order No. 745-A, 137 FERC ¶ 61,215 (2011), *reh'g denied*, Order No. 745-B, 138 FERC ¶ 61,148 (2012), *appeal docketed sub nom.*, *Elec. Power Supply Ass'n v. FERC*, Nos. 11-1486, *et al.* (D.C. Cir. Dec. 23, 2011).

[8]   *See generally New England Power Pool and ISO New England, Inc.*, 100 FERC ¶ 61,287 at PP 117-26 ("September 2002 Order"), *on reh'g and compliance*, 101 FERC ¶ 61,344 at PP 37-49 (2002) ("December 2002 Order").   The DALRP, along with other load response programs, is described in and governed by the rules set forth in the ISO-New England Load Response Manual (the "DALRP Manual") and in ISO-NE's FERC Electric Tariff No. 3 ("Tariff"), as they were revised from time to time.   During the period of the alleged violations. the portion of the Tariff that governed DALRP, Section III, Market Rule 1, Appendix E ("Appendix E") did not provide any details whatsoever as to how the Customer Baseline should be set.   *See* Ex. 3 [Tariff, Appendix E (effective as of December 1, 2006)], generally.   (Exhibit 3 contains a copy of the version of Appendix E that was in effect as of December 1, 2006.   All of the substantive DALRP provisions in the December 1, 2006 version remained in effect throughout the relevant period, until amended effective February 7, 2008.   Certain non-substantive revisions were made during this period, for example, on June 15, 2007 to extend the term of ISO-NE's demand response programs (Section III.E.1.3) and on July 31, 2007 to revise ISO-NE's internet communications protocols (Section III.E.7).).   The only description of baseline-setting methodology was in the DALRP Manual.   The DALRP Manual provisions governing the Customer Baseline and the "performance" measurement (*i.e.*, the quantity of a demand response provider's reduction in consumption) in the version that Lincoln reviewed were in effect as of April 7, 2006 and did not change until the DALRP Manual was discontinued and replaced in 2010.   *See* Ex. 4 [DALRP Manual, Rev. 9 (effective date Apr. 7, 2006)].

indicate that the maximum price they are willing to pay for energy," and "[w]hen the energy price exceed[ed] a customer's price bid," the customer would curtail its consumption from the ISO-NE grid and would thereby "avoid paying the day-ahead energy price" (*i.e.*, the LMP) for the increment of reduced consumption. *See* December 2002 Order at P 37. In addition to receiving a financial benefit equal to the avoided cost of the energy not consumed, customers would also receive "an additional financial benefit," *i.e.*, a second "payment for the amount of reduced load" equal to the applicable LMP. *Id.* at P 38.

### C.     The Initial DALRP Rules

To participate in DALRP, a customer first had to establish a baseline for the purpose of measuring the amount of load reductions. *See* Ex. 4 at § 4.2. But the DALRP Manual and the Tariff provided no guidance on the crucial issue of how a retail customer with BTMG like Lincoln should set its baseline or operate its equipment, and specifically its BTMG, when the initial baseline measurements are obtained. *See generally,* Ex. 3 and Ex. 4. Nor did any other FERC or ISO-NE rules, regulations, or pronouncements at this time provide such guidance.[9]

The DALRP Manual did go into considerable detail regarding the technical aspects of *measuring* a customer's initial baseline. *See* Ex. 4 at § 4.2.1. The DALRP Manual also provided that a customer's initial DALRP baseline would be self-correcting in some circumstances, *i.e.*, it would automatically adjust based on actual operating data if a bid was not made or accepted into the program (but would otherwise stay the same). *See id.* None of this detail, however, spoke to how the customer baseline was to be set.

---

[9]   In the Tariff, the term "Customer Baseline" was defined, for the purposes of the DALRP, as "the average aggregate hourly load, rounded to the nearest kWh, for each of the 24 hours in a day for each Individual Customer." Ex. 6 [Tariff (effective date Feb. 16, 2007)] at § III.1.3.2, Original Sheet No. 7018A. The Customer Baseline definition did not change during the relevant time period.

### III.    LINCOLN'S PARTICIPATION IN DALRP

In the Spring of 2007, Lincoln was approached by multiple companies seeking to recruit Lincoln to participate in DALRP.  *See* Ex. 2 at 9.  In April 2007, representatives of Constellation visited Lincoln's headquarters and solicited Lincoln to participate in DALRP and use Constellation as Lincoln's "Enrolling Participant."  Compl., Ex. 2, Appendix A [Enforcement Staff Report and Recommendation] at 7.  Constellation proposed to collect 15 percent of all program revenues that Lincoln received in return for Constellation providing various services as Lincoln's Enrolling Participant.[10]  Constellation only mentioned the customer baseline once during this presentation in a slide that depicted "dancing dollars" between the customer baseline and actual consumption, illustrating the incentives that DALRP created for companies like Lincoln.  Ex. 7 at 3 [Constellation PowerPoint (dated Apr. 6, 2007)].  In July 2007, Lincoln enrolled in DALRP with Constellation as its Enrolling Participant.  Compl. at ¶ 35.

Lincoln received no meaningful guidance from any entity or document on how to treat its BTMG when setting its baseline.  *See* Compl., Ex. 1 at P 23.  Lincoln set its initial baseline from July 25 to July 31, 2007 at 19.39 MW.  *Id.* at PP 16, 18.  When setting its baseline, Lincoln ran the Westinghouse at approximately one MW.  *See* Compl. at ¶ 38.  Between July 25, 2007 and February 7, 2008, Lincoln's baseline changed nine times, moving both up and down.  *See* Ex. 2 at 4.  Specifically, Lincoln's initial baseline on July 31, 2007 was 19.39 MW, and it ultimately decreased to 17.73 MW in February 2008, or a difference of 1.66 MW.  *Id.*[11]  Lincoln set its

---

[10]  These services included "sign[ing] up, set[ting] up, and train[ing] customers at cost to [Constellation]…[a]ssist[ing] the customers in the development of Load Curtailment strategies, and determin[ing the] amount of curtailment possible at different price levels… [and] provid[ing] self-certification of the customer's Load response capability…" . *See* Ex. 4 at § 2.7.

[11]  FERC alleges Lincoln overstated its baseline by three MW.  Compl. at ¶ 38.  In fact, over half of this alleged three MW overstatement (*i.e.*, 1.66 MW) disappeared by the end of the relevant period.

baseline consistent with its view that it was already providing demand response before its participation in DALRP, that DALRP payments were an "additional financial benefit" or incentive for its reduction of load, and that the Westinghouse was unreliable. *See id.* at 23.

## IV.    SUBSEQUENT CHANGES AND CLARIFICATIONS OF THE DALRP RULES

On February 5, 2008, ISO-NE proposed significant tariff revisions designed to reduce payments to DALRP participants by changing the minimum price, or "offer floor," for demand response resources. *See* Ex. 5, generally.[12]  ISO-NE did not propose any changes to its pre-existing baseline-setting rules, nor did it offer any other guidance on how baselines should be set. ISO-NE did, however, for the first time, assert that the baseline was intended to represent "normal daily consumption patterns." *Id.* at 16.

On April 4, 2008, FERC accepted ISO-NE's revisions, effective February 7, 2008.[13]  In the April 2008 Order, FERC noted ISO-NE's assertion "that Customer Baseline methodologies for demand response programs are complex, and that changes that could address the instant problem are by no means intuitive," and did not require ISO-NE to refine or change its existing rules.  April 2008 Order at P 29.  Then-Commissioner (and former Chairman) Jon Wellinghoff dissented from these orders because, in his view, ISO-NE's proposal left "unresolved the

---

[12]   According to ISO-NE, the revised Tariff provisions were intended to address "strategic behavior" by the majority of DALRP participants, namely, 26 out of 46 participants representing 75 percent of the amount of demand response cleared in DALRP. *See* Ex. 5 at 11.  ISO-NE did not describe this baseline-setting conduct as a violation of the Tariff or other rules, nor did it assert that this conduct was fraudulent or deceptive.  Instead, ISO-NE stated that this "strategic behavior" by most DALRP participants, in combination with the more than five-year old offer floor of $50/MWh, had produced an "unintended result" of causing participants' offers into DALRP to clear too often. *Id.* at 9.  ISO-NE proposed to fix the design flaw by replacing the $50/MWh minimum offer floor with a new floating minimum based on fuel costs.

[13]   *See* April 2008 Order.  In the April 2008 Order, FERC, echoing ISO-NE's assertion, stated, again for the first time, that the Customer Baseline "is intended to represent an asset's normal operating conditions."  April 2008 Order at P 5.  But FERC did not offer any further guidance on this issue.  Instead, in a related June 2008 order, FERC directed ISO-NE to file a report that "include[d] a review of the current Customer Baseline methodology and a timetable for implementing any changes necessary for demand resources to participate in its markets..." *ISO New England Inc.,* 123 FERC ¶ 61,266 at P 31 (2008).

fundamental problem as to how a customer's baseline load should be determined," and that this problem needed to be addressed.[14]   Then-Commissioner Suedeen Kelly wrote a separate concurrence expressing similar concerns.[15]

In 2011, and in compliance with FERC's Order No. 745, ISO-NE proposed to adopt an entirely new market design for demand response that provided more clarity on how to set a baseline,[16] and for the first time, prohibited the baseline-setting methodology that Lincoln used.[17] On January 19, 2012, FERC accepted ISO-NE's proposed changes to its demand response rules. *See ISO New England, Inc.*, 138 FERC ¶ 61,042 (2012) ("January 2012 Order"), *reh'g denied*, 139 FERC ¶ 61,116 (2012).

## V.   FERC'S INVESTIGATION AND ALLEGATIONS

FERC commenced its investigation in February 2008 (Compl. at ¶ 57), at approximately the same time that ISO-NE submitted the February 2008 Filing.   In the course of the investigation, FERC Enforcement staff engaged in extensive discovery, obtained thousands of documents from Lincoln and third parties, and it deposed a total of nine witnesses, including two Lincoln employees.   *See id.* & Compl., Ex. 2, Appendix A at 2.

---

[14]   April 2008 Order at 61,105-06 (Wellinghoff, Comm'r, dissenting in part); *see also* September 2008 Order at 62,220 (Wellinghoff, Comm'r, dissenting in part) ("I continue to believe that issues related to accurate customer baselines are important and need to be addressed.").

[15]   *See* April 2008 Order at 61,105 (Kelly, Comm'r, concurring) (acknowledging that developing an accurate baseline methodology "may be a complex undertaking that requires significant time and resources," and "encourage[ing]" ISO-NE to work with its stakeholders to develop an appropriate methodology").

[16]   *See* Ex. 8 [ISO-NE August 2011 Filing], generally.   To implement the new market design, ISO-NE cancelled its existing Tariff provisions and replaced them with an entirely new Tariff section which provided detail on how BTMG could participate in ISO-NE's demand response programs and how customers with BTMG were to set their baselines.   *See* Ex. 9 [Tariff, Market Rule 1 Section III.8 and Appendix E (effective June 1, 2012)], generally.   Although this filing was made in compliance with Order No. 745, Order No. 745 did not require ISOs/RTOs to revise their baseline-setting rules, to adopt a standardized methodology, or provide any guidance on how BTMG should be run when setting the baseline.   Compl., Ex. 1 at P 39.

[17]   ISO-NE's new rules provided that the "Demand Response Baseline" should be set based on "expected electricity consumption … absent demand reduction payments."   *See* Ex. 9 at § III.E.7.

Lincoln was not permitted to conduct *any* discovery. It had no right to obtain any documents or testimony from FERC or the ISO-NE, or to subpoena third party witnesses or documents. Lincoln never had access to the documents or testimony FERC obtained from third parties (with the exception of the portions of the documents cited or quoted in FERC's public orders). Indeed, Lincoln still does not even know the identities of the seven third-party witnesses deposed by FERC. As a result, Lincoln has not been able to depose or confront any of the witnesses that may have relevant or exculpatory evidence.

On November 3, 2009, FERC informed Lincoln that it had preliminarily concluded that Lincoln had violated its Anti-Manipulation Rule.[18] On July 17, 2012, FERC issued its "Order to Show Cause and Notice of Proposed Penalty" in which it directed Lincoln to show cause why it had not violated Section 222 and FERC's Anti-Manipulation Rule in connection with its participation in DALRP. *See* Compl., Ex. 2.[19] On August 29, 2013, FERC issued its Penalty Assessment Order in which it found that Lincoln had engaged in market manipulation, assessed against Lincoln a civil penalty of $5 million dollars, and directed Lincoln to pay the penalty and disgorge $379,016.03, plus interest, to ISO-NE within 60 days. *See* Compl., Ex. 1 at P 79. Lincoln rejects FERC's findings, and therefore did not pay the civil penalty.

---

[18] On January 25, 2011, FERC issued the first public document in the FERC proceeding, entitled "Staff Notice of Alleged Violations," in which it alleged that Lincoln violated the Anti-Manipulation Rule. *See* Ex. 10 [Staff Notice of Alleged Violations]. On May 5, 2011 and again on August 4, 2011, Lincoln submitted non-public responses to FERC Enforcement staff, denying FERC's allegations. *See* Compl., Ex. 2, Appendix A at 2.

[19] FERC also provided notice, as required by FPA Section 31(d)(1), that Lincoln may elect either (1) an administrative hearing before an Administrative Law Judge, pursuant to Section 31(d)(2) of the FPA, or (2) an immediate assessment of civil penalties by FERC that will be subject to de novo review of the facts and the law by the appropriate U.S. district court. *See* Compl., Ex. 2 at P 3. On August 14, 2012, Lincoln elected the option for *de novo* review in U.S. district court. *See* Ex. 11 [Lincoln Notice of Election]. On September 14, 2012, Lincoln submitted its answer to the Show Cause Order. *See* Ex. 2, generally.

## ARGUMENT

I.  **FERC'S CLAIM FOR CIVIL PENALTIES IS BARRED BY THE FIVE-YEAR STATUTE OF LIMITATIONS IN SECTION 2462**

As FERC itself admits, a claim for civil penalties is governed by the general, five-year statute of limitations in Section 2462 that applies to statutes that, like the FPA, do not specify a limitation period for such claims.[20]  The Complaint alleges that Lincoln's violations of Section 222 occurred from July 25, 2007 through February 7, 2008.  Compl. at ¶¶ 37, 45, and 83.  Thus, FERC was required to file its Complaint no later than February 7, 2013, and FERC's December 2, 2013 Complaint is time-barred.

### A.  The Supreme Court Recently Held That Section 2462 Bars An Action To Enforce A Civil Penalty Filed More Than Five Years After The Violation

Just this past year, the Supreme Court interpreted Section 2462 as barring any action to enforce a civil penalty in a district court that, like FERC's Complaint, was filed more than five years after the date of the alleged violation(s).  In *Gabelli*, the Court unanimously held as time-barred an SEC enforcement action seeking civil penalties for alleged violations of the very SEC rule and statutory provision on which FERC's Anti-Manipulation Rule and Section 222, respectively, are modeled (namely, SEC Rule 10b-5 and Section 10(b) of the Securities Exchange Act of 1934) where the violations ended in 2002 and the SEC did not file its complaint in district court until 2008.  The Court held that, under the plain language of Section 2462, the claim accrues, and the five-year period begins to run, *on the date the violations occurred.*[21]

---

[20]  *See*, *e.g.*, *Prohibition of Energy Market Manipulation*, Order No. 670, 114 FERC ¶ 61,047 at P 62 (2006) (stating that 28 U.S.C. § 2462 applies to civil penalty claims for violation of Section 222).  Section 2462 provides, in relevant part, that "an action, suit or proceeding for the enforcement of any civil fine, penalty, of forfeiture, … shall not be entertained unless commenced within five years from the date when the claim first accrued …"  28 U.S.C. § 2462.

[21]  The Court emphasized that allowing the government to bring suit more than five years after the date of the

[Footnote continued on next page]

The Court's holding in *Gabelli* was not limited to enforcement actions by the SEC, and is not dependent on the peculiarities of the SEC's regulations or enforcement procedures. Indeed, courts have subsequently applied *Gabelli* to bar enforcement actions brought more than five years after the date of the alleged violation by other federal agencies that have their own specific enforcement procedures.[22]  In any event, FERC's pre-complaint administrative procedures are very similar to, and in part modeled upon, the SEC's procedures.[23]

**B.     The "Additional" Limitations Period Found In *Meyer* Does Not Apply Here Because There Has Not Been An "Adjudicatory Proceeding" Below**

Recognizing that the five-year limitations period has expired, FERC may try to salvage its claim, as it has attempted in another action pending before this Court, by pointing to *United States v. Meyer*, 808 F.2d 912 (1st Cir. 1987). In *Meyer*, the First Circuit held that, *in certain circumstances not present here*, an agency may have an additional five-year period from the date of the final administrative *adjudication* of a civil penalty before an ALJ to bring suit to enforce the penalty. The *Meyer* court held such an additional period applies where a statutory scheme

---

[Footnote continued from previous page]

alleged violations would frustrate the equitable and due process goals that statutes of limitations are intended to serve, as it "would leave defendants exposed to Government enforcement action not only for five years after their misdeeds, but for an additional uncertain period into the future." *Gabelli*, 133 S.Ct. at 1223.

[22]   *See, e.g., CFTC v. Reisinger*, 2013 WL 3791691 (N.D. Ill. July 18, 2013) (dismissing Commodity Futures Trading Commission enforcement action for civil penalties); *United States v. Midwest Generation, LLC*, 720 F.3d 644 (7th Cir. 2013) (holding that violations of Clean Air Act permitting requirements administered by the Environmental Protection Agency were time barred).

[23]   *See generally* 17 C.F.R. § 202.5; SEC, Office of Chief Counsel, SEC Enforcement Manual (dated Oct. 9, 2013), *available at:* http://www.sec.gov/divisions/enforce/enforcementmanual.pdf; compared to *Submissions to the Commission upon Staff Intention to Seek an Order to Show Cause*, Order No. 711, 123 FERC ¶ 61,159 at P 4 (2008). Unlike FERC, however, the SEC's regulations give subjects the right to request to inspect and copy the non-privileged documents, testimony, and analyses in staff's investigative file, which subjects may then use to prepare their response. *See* 17 C.F.R. § 201.230(a)(1). Here, FERC has not provided Lincoln with access to FERC's investigatory file (save for the specific portions of individual documents or deposition transcripts that are cited or quoted in the show cause order or penalty assessment order) or any exculpatory evidence pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), and FERC's implementation of the *Brady* disclosure requirement. *See generally Enforcement of Statutes, Regulations, and Orders*, 129 FERC ¶ 61,248 (2009).

provides for judicial enforcement of a civil penalty, *and* the required "precondition to suit" is an "adjudicatory administrative proceeding" – rather than a mere "administrative determination[ ]" – the latter of which the *Meyer* court described as more akin to a "prosecutorial determination[ ]." *Meyer*, 808 F.2d at 914, 920.

The "adjudicatory administrative proceeding" described in *Meyer*, is a specific type of proceeding (far different from what FERC engaged in here) where there is "notice, discovery and hearing" before an ALJ and governed by the APA, its "adjudicatory rules" and implementing regulations. *See id.* at 919-20. The Meyer court further emphasized that:

> the APA's adjudicatory rules [are] designed to ensure procedural fairness, afford the private litigant a wide range of protections during the administrative processing of his case. By way of illustration, these rules provide *a full panoply* of discovery devices. *See* 15 C.F.R. § 388.9(b) (interrogatories, requests for admission, and production of documents), § 388.9(c) (depositions), § 388.10 (subpoenas), § 388.11 (protective orders) . . . . [and where] the respondent enjoys a right of appeal.

*See id.* at 919 (emphasis added). The *Meyer* court held that Section 2462 provided an additional five-year period in such proceedings because where there is an *adjudicatory proceeding before an ALJ under the rules of the APA* "the timing of the case is largely beyond the [agency's] control." *Id.* And, application of a single five-year period would mean that "the statute of limitations would have expired *before* the right to sue arose." *Id.* By contrast, where the "precondition to suit" is more akin to a prosecutor's determination of the penalty and "decision to bring suit," rather than an adjudicatory administrative proceeding, then the "determinations fall entirely within the suzerainty of the government;" if an agency fails to bring an enforcement action within the five-year period, it "would have only its own indecision to blame." *Id.*[24]

---

[24]   Post-*Gabelli*, *Meyer* may no longer be good law. *Meyer* creates exactly the type of uncertainty the Supreme Court cautioned against in *Gabelli* when it emphasized "the importance of time limits on penalty actions,"

[Footnote continued on next page]

FERC did not assess civil penalties against Lincoln in an adjudicatory proceeding.  There was no administrative hearing overseen by an ALJ and governed by the APA.  Nor was Lincoln provided *any* opportunity to conduct discovery, let alone provided the "*full panoply of discovery devices*" provided for under the APA, as the Show Cause Order did not set any matters for hearing.  Indeed, Lincoln has not been given access to the full testimony or all documents provided to FERC by third party witnesses or experts; Lincoln has not been allowed to depose or cross examine those witnesses or experts (or to even know who they are); and Lincoln had no right to appeal FERC's decision to impose a penalty.  Instead, FERC assessed a penalty based solely on the limited materials provided to the Commission by FERC Enforcement staff and Lincoln's response (which reflected only the information in Lincoln's possession).[25]  Where an administrative process "lacks the basic elements common to adversarial adjudication" such as "the right to a hearing" and the "opportunity to question witnesses" it is not an "adjudication" within the meaning of *Meyer*, and the five-year limitations period in "Section 2462 is not affected."  *FEC v. Nat'l Republican Senatorial Comm.*, 877 F. Supp. 15, 19 (D.D.C. 1995).[26]

---

[Footnote continued from previous page]

explaining that adding exceptions to the five-year rule "would leave defendants exposed to Government enforcement action not only for five years after their misdeeds, but for an additional uncertain period into the future." *Gabelli*, 133 S. Ct. at 1223.  *Meyer* holds that the statute of limitations in Section 2462 is satisfied at the *initiation* of an agency adjudicating proceeding and adds an additional five-year limitation period at the *conclusion* of an agency adjudicative proceeding.  But the period in between the *initiation* and the *conclusion* of that agency adjudication is undefined and not subject to any limitations period.  Agency adjudications can easily last as long as five or ten years or more.  As a result, *Meyer* potentially extends the statute of limitations under Section 2462 to 15 or 20 years—a period likely impermissible under *Gabelli*.

[25]  Moreover, during the four and a half years from the commencement of the investigation until the issuance of the Show Cause Order in July 2012, Enforcement staff was free to engage in written and oral *ex parte* communications with the ultimate decision-makers, FERC's Commissioners, whereas Lincoln and its counsel have never been permitted to speak directly to FERC's Commissioners.

[26]  The issue of whether FERC's investigation and administrative process was an "adjudication" is significant because FERC takes the position that the Court should "affirm [FERC's] penalty assessment without modification" and based solely on a review of the Penalty Assessment Order.  Compl. at ¶ 86.  Thus, FERC would have this Court order Lincoln to pay a $5 million penalty without, as the FPA requires, any discovery, a

[Footnote continued on next page]

Unlike the administrative adjudication in *Meyer*, the timing of FERC's determination of Lincoln's civil penalty here has been *entirely* under FERC's control.[27]   FERC chose to wait until August 29, 2013 to make its determination of the civil penalty.[28]   As the *Meyer* court put it, FERC has "only its own indecision to blame" for missing the five-year limitations window.[29]

## II.   FERC LACKS JURISDICTION OVER LINCOLN'S CONDUCT

The conduct at issue in the Complaint – Lincoln's participation in DALRP – involved

---

[Footnote continued from previous page]
> trial, or *de novo* determinations of fact and law by a court.  Lincoln's right to *de novo* review is a critical point on which, if this action continues, the parties should be given the opportunity to fully brief and be heard.

[27]   FERC could have issued an order to show cause and notice of proposed penalty at any point after it concluded its investigation on January 25, 2011 (the date FERC issued its public notice of alleged violations).  *See* Ex. 10.  But FERC chose to wait eighteen months, until July 2012, to issue its Show Cause Order.  Compl., Ex. 2.  One month later, Lincoln exercised its right, under Section 31(d) of the FPA, to request that FERC "promptly assess" a civil penalty, and one month after that (in September 2012) Lincoln filed its answer.  *See* Ex. 11.  FERC should have issued its Penalty Assessment Order "promptly" after Lincoln provided its notice of election under Section 31(d)(3)(a) of the FPA, and if Lincoln decided not to pay the penalty, FERC should have filed its complaint to enforce the penalty before February 7, 2013.  Instead, FERC waited more than a year from Lincoln's election of *de novo* review to assess the proposed penalty and allowed the limitations period to expire.

[28]   This action should also be dismissed because FERC violated the FPA's requirement that the Assessment Order be issued "promptly" after Lincoln's Notice of Election.  Rather than abide by the plain language of the FPA, FERC *waited more than a year* after Lincoln's Notice of Election to issue the Assessment Order.  FPA Section 31(d)(3)(a) requires that the Commission "shall *promptly* assess such penalty, by order, after the date of the receipt of the notice [of election]. . . ."  FERC has previously acknowledged, *in this case*, that "promptly" after the notice of election means "an immediate penalty assessment."  Compl., Ex. 2 at P 3.

As Acting-Chairman LaFleur explained in her dissent in *Barclays Bank, PLC,* 143 FERC ¶ 61,024 (2013):

> [I]f an entity elects the procedures under Section 31(d)(3)(A)], the Commission is required by section 31(d)(3)(A) to "promptly assess" a civil penalty.  If the entity does not pay the penalty within 60 days, the Commission must institute an action in federal district court to affirm the penalty.  In such a case, the court is to review the facts and law underlying the penalty *de novo*. . . .  An action that is done "promptly" is done "at once or without delay." . . . While reasonable people can disagree over how immediate a prompt assessment must be, there can be no disagreement that a prompt assessment is an assessment of an immediate nature.

[29]   Even if the FERC proceeding could somehow be considered an "adjudication," this action is still time barred because FERC did not "commence" its adjudicatory proceeding before the "first" five-year limitations period under *Meyer* ran out.  FERC issued its Penalty Assessment Order against Lincoln on August 29, 2013, but the five-year period in which FERC was required to "commence" its "proceeding for the enforcement" of a civil penalty expired on February 7, 2013.  Although FERC issued a Show Cause Order against Lincoln on July 17, 2012, this order did not "assess" a penalty and thus there was nothing to "enforce" at that time.  The first instance in which there was anything to "enforce" was after FERC issued its August 2013 Penalty Assessment Order.  But this order came too late; the limitations period had already expired.

Lincoln's decision to reduce its consumption, *i.e., to forego retail purchases of energy*. However, the Supreme Court has held that FERC's jurisdiction is limited to *wholesale sales* of electric energy. *New York v. FERC*, 535 U.S. 1, 20 (2002). Thus, FERC's jurisdiction does not extend to the *retail non-purchases* that constituted Lincoln's participation in DALRP.[30]

### 1. FERC Has Jurisdiction Over Wholesale Sales of Electricity, But Not Over Demand Response, Which Is a Retail Non-Purchase

In *New York*, the Supreme Court declared that FERC's "jurisdiction over the *sale* of power has been specifically confined to the wholesale market." 535 U.S. at 20. As a "creature of statute," FERC possesses only the authority that Congress has conferred upon it; "if there is no statute conferring authority, FERC has none." *Atl. City Elec. Co. v. FERC*, 295 F.3d 1, 8 (D.C. Cir. 2002) (internal citation omitted). The FPA grants FERC jurisdiction over "transmission of electric energy in interstate commerce and the sale of such energy at wholesale in interstate commerce," but forbids it from regulating "any other sale of electric energy," including transactions "subject to regulation by the States." 16 U.S.C. §§ 824(a) and (b)(1). In enacting the FPA, Congress drew a "bright line" distinction "between federal and state jurisdiction" in the electric industry. *So. Cal. Edison*, 376 U.S. at 215-216.

Under FERC precedent and regulations, demand response is not considered to be either a wholesale sale or transmission service. FERC's regulations define "demand response" as a "reduction in consumption of electric energy by customers." 18 C.F.R. § 35.28(b)(4). Moreover, FERC has confirmed that it "does not view demand response as a resale of energy

---

[30] In Order No. 745, FERC adopted its current policy on demand response compensation and the treatment of BTMG. Parties representing a cross-section of the energy industry (including merchant generators, municipal utilities, consumer groups, ISOs/RTOs, and state commissions) have challenged this order, arguing, among other things, that it exceeds FERC's jurisdiction because it impermissibly regulates retail transactions and intrudes on areas of exclusive State jurisdiction. The issue, argued this past September, is *sub judice* before the D.C. Circuit. *See Elec. Power Supply Ass'n v. FERC,* Nos. 11-1486, et al. (D.C. Cir. Dec. 23, 2011).

back into the [wholesale] energy market."  *See* Order No. 745 at 64; s*ee also EnergyConnect, Inc.*, 130 FERC ¶ 61,031 at P 30 (2010).

**2.      FERC Cannot Exercise Jurisdiction Over Demand Response As a Practice "Affecting or Pertaining to" Wholesale Rates**

Section 205 of the FPA grants FERC jurisdiction over (1) "[a]ll rates and charges made, demanded, or received by any public utility for or in connection with the transmission or sale of electric energy subject to the jurisdiction of the Commission," and (2) "all rules and regulations affecting or pertaining to such rates or charges."  16 U.S.C. § 824d(a).  Although FERC does not have jurisdiction over retail sales, FERC has determined that it could regulate demand response by redefining such retail non-purchases as a wholesale service, "rule[] and regulation[] affecting or pertaining to" FERC-jurisdictional wholesale rates.  *See* Order No. 745 at P 112 (citing 16 U.S.C. § 824d); Compl. at ¶ 81.  FERC has thus concluded that a retail customer's decision not to make a retail purchase in response to the incentive payments for demand response is equivalent to generating energy and making it available for sale at wholesale.

This argument is without merit.  The stated purpose of DALRP is to "encourage retail customers to reduce consumption during peak demand periods," *see* September 2002 Order at P 117, by providing an "additional financial benefit" in the form of an additional "payment for the amount of the reduced load."  *See* December 2002 Order at P 38.  DALRP sets retail rates insofar as it pays *retail customers* for reducing their *retail purchases* of electricity that are "subject to regulation by the States."  16 U.S.C.§ 824(a).  And the FPA prohibits FERC from regulating retail transactions.  *See FPC v. Conway Corp.*, 426 U.S. 271, 276-77 (1976) (the FPA was structured to "foreclose the possibility that" FERC's predecessor, "would . . . regulat[e] the nonjurisdictional, retail price").

FERC is thus foreclosed from indirectly regulating non-jurisdictional retail rates through

21

the exercise of its authority over public utilities' FERC-jurisdictional rates.  *See Richmond Power & Light v. FERC*, 574 F.2d 610, 620 (D.C. Cir. 1978) (holding that what the FPC "is prohibited from doing directly it may not achieve by indirection.").  Because demand response is not a service subject to FERC's jurisdiction, however, the Complaint represents an impermissible "attempt[] to do indirectly what it [may] not do directly."  *Altamont Gas Transmission Co. v. FERC*, 92 F.3d 1239, 1248 (D.C. Cir. 1996).

### III.   FERC FAILED TO PROVIDE FAIR NOTICE OF THE CONDUCT IT NOW CONSIDERS IMPROPER

#### A.   The Fair Notice Doctrine

As the Supreme Court recently explained in *Fox*, "[a] fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required."  *Fox*, 132 S. Ct. at 2317 (citations omitted).

> This requirement of clarity in regulation is essential to the protections provided by the Due Process Clause of the Fifth Amendment.  It requires the invalidation of laws that are impermissibly vague.  A conviction or punishment fails to comply with due process if the statute or regulation under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.

*Id.* (internal citations and quotation marks omitted).  Thus, "where the regulation is not sufficiently clear to warn a party about what is expected of it – an agency may not deprive a party of property by imposing civil or criminal liability."  *Gen. Elec.*, 53 F.3d at 1328-29.

Known as the "void for vagueness" doctrine, it addresses two discrete due process concerns: "first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not

act in an arbitrary or discriminatory way."[31]  *Id.*  This Court has described these concerns as "fair

notice" and "fair enforcement," either of which is sufficient to invalidate a law or regulation for

vagueness.  *United States v. Lachman*, 278 F. Supp. 2d 68, 91-97 (D. Mass. 2003) (Woodlock,

J.).[32]

> The Due Process Clause imposes on an agency seeking to enforce its regulations the

"responsibility to state with ascertainable certainty what is meant by the standards [it] has

promulgated," *Diamond Roofing Co. v. OSHRC*, 528 F.2d 645, 649 (5th Cir. 1976), and to do so

"*before* depriving a party of property." *Fabi Constr. Co. v. Sec'y of Labor*, 508 F.3d 1077, 1088

(D.C. Cir. 2007) (emphasis added) (citation omitted).  In *General Electric*, the D.C. Circuit

declared that "'elementary fairness compels clarity' in the statements and regulations setting

forth the actions with which the agency expects the public to comply," *Gen. Elec.*, 53 F.3d at

1329 (quoting *Radio Athens*, 401 F.2d at 404), and explained that, where there is no "pre-

enforcement warning" of an agency's interpretation, a regulated party has fair notice:

> [i]f by reviewing the regulations and other public statements issued by the agency,
> a regulated party acting in good faith would be able to identify, with
> "ascertainable certainty," the standards with which the agency expects parties to
> conform...

*Gen. Elec.*, 53 F.3d at 1329 (quoting *Diamond Roofing*, 528 F.2d at 649).  Conversely, where an

---

[31]  While the "void for vagueness" doctrine was initially developed in the context of criminal statutes, courts have long recognized the requirement to provide fair notice "in the civil administrative context." *Gen. Elec.*, 53 F.3d at 1329 (citing *Radio Athens, Inc. v. FCC*, 401 F.2d 398, 404 (D.C. Cir. 1968)).  "This requirement has now been thoroughly 'incorporated into administrative law.'"  *Gen. Elec.*, 53 F.3d at 1329 (quoting *Satellite Broadcasting Co. v. FCC*, 824 F.2d 1, 3 (D.C. Cir. 1987)).

[32]  The First Circuit reversed, on factual grounds, the Court's finding that the regulation in question in *Lachman* did not provide fair notice due, among other things, to the conflicts between the agency's public statements and non-public interpretation of the regulation because the First Circuit concluded that the defendants did not have access to the non-public interpretation that gave rise to the conflict.  *See United States v. Lachman,* 387 F.3d 42 (1st Cir. 2004).  The First Circuit did not, however, question the Court's description or analysis of the legal doctrine at issue.

agency first announces its interpretation of a vague regulation in an administrative proceeding,

> the regulations and other policy statements are unclear, the [regulated party]'s interpretation is reasonable, and where the agency itself struggles to provide a definitive reading of the regulatory requirements, *a regulated party is not 'on notice' of the agency's ultimate interpretation of the regulations, and may not be punished.*

*Gen. Elec.*, 53 F.3d at 1333-34 (emphasis added); s*ee also Satellite*, 824 F.2d at 3-4.

The Supreme Court has expressed concerns that giving deference to agencies' interpretations of their "own ambiguous regulations":

> [C]reates a risk that agencies will promulgate vague and open-ended regulations that they can later interpret as they see fit, thereby frustrat[ing] the notice and predictability purposes of rulemaking.

*Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2168 (2012) (citation and quotation marks omitted).[33]  In *Christopher*, the Supreme Court found that deference was not appropriate where vague regulations "require regulated parties to divine the agency's interpretation in advance or else be held liable when the agency announces its interpretation for the first time in an enforcement proceeding, and demands deference."  *Id.*

FERC has repeatedly found that tariff provisions that are vague and ambiguous are unenforceable.[34]  FERC's then-Chairman declared in 2007 that FERC "*should not impose a civil penalty for violating a regulatory requirement that is ambiguous*."  Ex. 12 [Kelliher Enforcement

---

[33]  Courts have consistently distinguished between the deferential standard for review of an agency's interpretations of its own regulations, and the more searching inquiry into fair notice that applies where the agency seeks to impose a civil penalty based on its interpretation of its regulations.  For example, in *Gates & Fox Co., Inc. v. OSHA*, 790 F.2d 154 (D.C. Cir. 1996), then-D.C. Circuit Judge Scalia noted that "Courts must give deference to an agency's interpretation of its own regulations," but then emphasized that "[w]here the imposition of penal sanctions is at issue, however, the due process clause prevents that deference from validating the application of a regulation that fails to give fair notice of the conduct it prohibits or requires."  *Id.* at 156-57 (citations omitted).

[34]  *Nw. Pipeline Corp.*, 109 FERC ¶ 61,356 at PP 7, 9 (2004); *Tres Palacio Gas Storage LLC*, 126 FERC ¶ 61,167 at P 11 (2009); *Neptune Reg'l Transmission Sys. LLC*, 111 FERC ¶ 61,455 at P 21 (2005).

Conference Policy Statement] at 5 (emphasis added).  Chairman Kelliher added that:

> If in the course of its action on an investigation the Commission clarifies our regulatory requirement for the first time, we should give the regulated community an opportunity to come into compliance with our newly clarified regulatory requirement.

*Id.*  The Complaint should be dismissed because FERC's regulations and ISO-NE's rules were silent as to how it should set its baseline and FERC's attempt to retroactively apply its new interpretation of a vague regulation for the first time in an administrative proceeding has deprived Lincoln of fair notice.

### B.   DALRP Rules Did Not Provide Fair Notice Because They Were Silent Regarding How To Set A "Baseline"

FERC has never defined the term "baseline" in its demand response regulations, nor has it required ISOs/RTOs to adopt a standardized baseline-setting methodology.  *See, e.g.,* Compl., Ex. 1 at P 39.  The DALRP rules in effect from July 2007 to February 2008 provided only mechanical, mathematical formulas for calculating the Customer Baseline (*i.e.*, as a simple hourly average) and the "performance" of DALRP participants (*i.e.*, the amount of load reduction).[35]  FERC's regulations and ISO-NE's Tariff and manuals were *completely silent* as to how an entity like Lincoln should set its baseline or how it should operate its BTMG when doing so, and thus failed to provide the constitutionally required fair notice of the interpretation that FERC has now adopted; if any FERC or ISO-NE rule had spoken to this issue, FERC would have cited to it in its Complaint or orders, which it has not.  In particular, neither the ISO-NE Tariff nor the DALRP Manual stated that, as FERC appears to contend, the baseline for a BTMG

---

[35]  ISO-NE first defined the term Customer Baseline in January 2006 as "the average aggregate hourly load, rounded to the nearest kWh, for each of the 24 hours in a day for each Individual Customer."  *See* Ex 6.  Section 4.2 of the DALRP Manual provided some additional detail on how this average should be calculated, *see* Ex. 4 at § 4.2, but it provided no indication that Lincoln's conduct was improper.

should be set to some undefined standard for "normal" energy consumption or operations or that a customer should not, or could not, curtail the output of its BTMG in setting its baseline. *See, e.g.,* Compl. at ¶¶ 6, 24-27.  In fact, neither the word "normal" (or any of its common synonyms) nor the concept of "normal operations" appears anywhere in the Tariff or the DALRP Manual in effect at that time. *See* Exs. 3 and 5, generally.   It is telling that FERC had to rely on the demand response definition adopted by *another agency* (namely, the DOE), rather than a FERC or ISO-NE rule, to support its assertion that the provision of demand response requires a change from "normal" consumption patterns.  Compl. at ¶ 24 (quoting 2006 DOE Report at 9).

Indeed, FERC Commissioners even after the period in question acknowledged and expressed concern about this vagueness, but did not provide any relevant guidance or direct ISO-NE to change its rules to provide more clarity.  In the April 2008 Order, for example, FERC acknowledged "that Customer Baseline methodologies for demand response programs are complex," and "by no means intuitive."  April 2008 Order at P 29.  Further, FERC's former Chairman Jon Wellinghoff dissented, emphasizing that:

> ISO-NE's proposal leaves unresolved the fundamental problem as to how a customer's baseline load should be determined.[36]

FERC has thus admitted that the baseline setting rules in effect at the time (and for years thereafter) were vague and lacked clarity.

### C.   FERC Seeks to Penalize Lincoln Based on an Interpretation First Announced in an Administrative Proceeding

The Complaint fails to meet the basic constitutional requirement of due process.  FERC

---

[36] April 2008 Order at 61,105-06; *see also* September 2008 Order at 62,220 (Wellinghoff, Comm'r, dissenting in part) ("I continue to believe that issues related to accurate customer baselines are important and need to be addressed."); April 2008 Order at 61,105 (Kelly, Comm'r, concurring) (acknowledging that developing an accurate baseline methodology "may be a complex undertaking that requires significant time and resources, and "encourage[ing]" ISO-NE to work with its stakeholder to develop an appropriate methodology).

does not even allege that Lincoln violated any specific provision of the Tariff or DALRP Manual in effect at the time of the alleged violations.  Nor could it, given that FERC itself recognized that its baseline setting rules at the time were vague and lacked clarity.[37]  Instead, FERC seeks to penalize Lincoln for an interpretation of its baseline setting rules that it first "announced," in a sense, in the course of its investigation of Lincoln.  This, of course, was after the conduct in question occurred.

With no guidance from FERC or ISO-NE, Lincoln set its baseline based on its good faith reading of ISO-NE's rules, and there are no specific allegations in the Complaint to the contrary. Specifically, Lincoln set its baseline by curtailing its BTMG in accord with its view that it was already providing demand response before it began participating in DALRP, that DALRP was an incentive to continue to do so, and that the Westinghouse was unreliable.  This was a reasonable interpretation in the absence of any contrary guidance.   Lincoln's BTMG reduced its consumption of energy from the grid, and thereby furthered the purpose of DALRP.[38]  Moreover, Lincoln's conduct was "objectively reasonable," not only in light of the existing ISO-NE rules and FERC's prior orders and guidance (or, the lack thereof), but because it was consistent with the customs and practice of this nascent industry.[39]

---

[37]  The baseline setting rules were vague, not in the sense that they required demand response providers "to conform [their] conduct to an imprecise but comprehensible normative standard, *but rather in the sense that no standard of conduct is specified at all.*"  *Lachman*, 278 F. Supp. 2d at 94 (quoting *Coates v. Cincinatti*, 402 U.S. 611, 614 (1971)) (emphasis added); *see also Trinity Broad. v. FCC*, 211 F.3d 618, 629-30 (overturning agency's finding of violation and sanction on fair notice grounds where the agency had "failed to provide a relevant definition for the key regulatory term" in the regulation that it alleged had been violated).

[38]  ISO-NE, the entity that drafted and administered both the initial DALRP rules and the February 2008 amendments, did not describe Lincoln's conduct as a violation of its rules in any public document.  *See* Ex. 5, generally.

[39]  Courts have held that "[c]ompliance with industry standard and custom serves to negate conscious disregard and to show that the defendant acted with a nonculpable state of mind."  *Drabik v. Stanley-Bostich, Inc.*, 997 F.2d 496, 510 (8th Cir. 1993).  According to ISO-NE, the majority of DALRP participants – namely, 26 out of

[Footnote continued on next page]

It was not until August 2011 that ISO-NE proposed clarifications to its rules that arguably prohibited Lincoln's baseline-setting methodology.[40]  ISO-NE's decision in 2011 to "clarify" its previous rules in a manner that, for the first time, prohibited Lincoln's behavior provides further evidence that Lincoln's conduct was not prohibited in 2007-2008 and that, even if FERC believed it was at that time, Lincoln did not have fair notice of FERC's view.[41]

Where, as here, an agency announces its interpretation of its regulations for the first time in an administrative proceeding and seeks to impose retroactive liability for past violations preceding that announcement, "a regulated party is not 'on notice' … and may not be punished" if the agency's "regulations and other policy statements are unclear, the [regulated party]'s interpretation is reasonable, and where the agency itself struggles to provide a definitive reading of the regulatory requirements." *Gen. Elec.*, 53 F.3d at 1333-34.  The Complaint must therefore be dismissed because it would force regulated parties like Lincoln to play the type of regulatory "Russian Roulette" that violates due process.  *Satellite*, 824 F.3d at 4.

### D.    FERC's Standardless Interpretation of its Rules Authorizes Arbitrary and Discriminatory Enforcement

FERC's *post hoc* expansion of its Anti-Manipulation Rule to cover Lincoln's conduct

---

[Footnote continued from previous page]

46, representing approximately 75 percent of the capacity in the program – set their baselines in a manner similar to Lincoln's at this time.  *See* Ex. 5 at 11.

[40]  In the August 2011 Order No. 745 compliance filing, ISO-NE adopted an entirely new market design and rules for demand response which provided that the "Demand Response Baseline" should be set based on "expected electricity consumption … absent demand reduction payments."  *See* Ex. 8 at § III.E.7.

[41]  *See*, *e.g.*, *Gen Elec.*, 53 F.3d at 1332 (holding that amendments to regulation made after the date of the alleged violations "clarifying" that the conduct in question violated the amended regulation supported the "argument that, prior to the amendments, [the regulation] fully authorized" the conduct "and that the company could not therefore have been on notice of the agency's contrary interpretation"); *see also Beaver Plant Operations, Inc. v. Herman*, 223 F.3d 25, 31 (1st Cir. 2000) (holding that fair notice doctrine prohibited agency from sanctioning employer for violating agency guidelines set forth in non-public interpretive letters that were not made public until after the date of the alleged violations); *Upton v. SEC*, 75 F.3d 92, 98 (2d Cir. 1996) (same).

must also be rejected because, if accepted here, it would "authorize and even encourage arbitrary and discriminatory enforcement."  *Lachman*, 278 F. Supp. 2d at 91 (quoting *Chicago v. Morales*, 527 U.S. 41, 56 (1999)).  FERC seeks to extend the scope of its Anti-Manipulation Rule to cover non-fraudulent conduct based on an overly broad and unsupported definition of fraud.[42]  The Court should not grant deference to FERC's broad interpretation of its own regulation as it would allow FERC "to function not only as judge, jury, and executioner but to do so while crafting new rules."  *Elgin*, 718 F.3d at 494.  FERC is prohibited from playing all of these roles both under general principles of administrative law and under the specific requirements of Section 31(d)(3)(B) of the FPA.  That section provides that this Court – rather than FERC – is to review *de novo* all issues of fact and law, without deference to FERC's findings of fact or legal conclusions.  The Complaint should be dismissed because it represents the kind of arbitrary and discriminatory enforcement that due process and the fair notice doctrine prohibits.[43]

## IV.   THE COMPLAINT FAILS TO PLEAD ITS CLAIM WITH PARTICULARITY

### A.   The Heightened Pleading Standards for Fraud

To state a claim under Section 222 and FERC's Anti-Manipulation Rule, FERC must

---

[42]   FERC states that, for the purposes of the Anti-Manipulation Rule, it "defines fraud generally, that is to include any action, transaction, or conspiracy for the purpose of impairing, obstructing, or defeating a well-functioning market."  Compl. at ¶ 20 (quoting Order No. 670 at P 50).  Order No. 670 in turn cites *Dennis v. United States*, 384 U.S. 855 (1966), which involved charges of conspiracy to defraud the federal government brought under a general conspiracy statute against individuals alleged to have filed false affidavits.  But the Supreme Court in *Dennis* based its finding of a violation on the defendants' *submission of fraudulent documents*; the Court did not suggest that a violation of that statute occurs in the absence of actual or attempted fraud.  *Id.* at 862.

[43]   In addition to being arbitrary, FERC's application of its Anti-Manipulation Rule is also discriminatory.  In two recent cases – *EnerNOC,* 134 FERC ¶ 61,158, at PP 18-20 (2011) and *Energy Spectrum, Inc. v. New York Indep. Sys. Operator, Inc.,* 141 FERC ¶ 61,197, at P 51 (2012) – FERC addressed ambiguous tariff provisions governing demand response programs administered by other RTOs.  In those cases, FERC held that RTOs were *not* permitted to change their rules without filing, for FERC review and approval, amendments to their tariffs to implement the new rules, and that market participants would *not* be sanctioned for failure to comply with the RTOs' new, unfiled rules.  Here, by contrast, FERC seeks to impose $5 million in penalties for actions that are consistent with, and not prohibited by, an at least as ambiguous provision.

plead that Lincoln did (1) "use or employ . . . any manipulative or deceptive device or contrivance (as those terms are used in section 10(b) of the Securities Exchange Act of 1934," (2) with *scienter*; and (3) "in connection with the purchase or sale of electric energy . . . subject to the jurisdiction of the Commission." *See* 16 U.S.C. § 824v; 18 C.F.R. § 1c.2.  In addition to the requirement that it plead facts supporting all three elements that are sufficient to make its claim "plausible," rather than speculative, *Twombly,* 550 U.S. at 570, for the first two elements FERC must meet the heightened pleading requirements of FRCP Rule 9(b), which requires that "a party must state with particularity the circumstances constituting fraud…" FRCP Rule 9(b).

"Particularity" requires that the Complaint include "'the time, place, and content of the alleged false or fraudulent representations.'" *Arruda v. Sears, Roebuck & Co.,* 310 F.3d 13, 19 (1st Cir. 2002) (internal quotations omitted), and "set[] forth specific facts that make it reasonable to believe that defendant knew that a statement was materially false or misleading." *Greenstone v. Cambex Corp.*, 975 F.2d 22, 25 (1st Cir. 1992).  Although a court must accept "all well-pleaded facts [alleged in the complaint] as true," *In re First Marblehead Corp. Sec. Litig.,* 639 F. Supp. 2d 145, 153 (D. Mass. 2009), the court need not "swallow the plaintiff's invective hook, line, and sinker." *Id.* (citing *Aulson v. Blanchard,* 83 F.3d 1, 3 (1st Cir. 1996)).  Further, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," *Ashcroft* v. *Iqbal,* 556 U.S. 662, 678 (2009) (citation omitted).  The Complaint, once its bald assertions and conclusory statements are stripped away, does not allege facts sufficient to state a claim under Section 222 or the Anti-Manipulation Rule that is plausible, much less one that satisfies the heightened pleading standards of FRCP Rule 9(b).

### B.     FERC Fails to Plead a Scheme to Defraud With Particularity

The Complaint fails to plead the first element of a claim under Section 222 of the FPA with particularity and should be dismissed.  FERC's claim that Lincoln's baseline was false rests

on the theory that baselines were meant to reflect "normal" electricity usage, and that Lincoln's curtailment of its BTMG during the baseline period was not "normal."  *See* Compl ¶¶ 38-40.  But the word "normal" and its common synonyms (such as customary, typical, usual, regular, established, standard, ordinary, and common) *do not appear* in the Tariff or DALRP Manual in effect during the relevant period.  Indeed, the Complaint fails to cite, quote, or otherwise state with particularity how DALRP participants were required to set their baseline. The Complaint does not allege that entities in Lincoln's position received *any guidance* whatsoever from FEFRC, ISO-NE or Constellation on how to set their baselines.  Thus, FERC's description of the DALRP rules represents only its *conclusions* on how a baseline should have been established.

Once FERC's theoretical conclusions are stripped away, the Complaint does not allege facts that would make FERC's *post hoc* contention that Lincoln's baseline was false plausible. And, in fact, FERC's own admissions make its claims *less* plausible.  For FERC's allegations to be plausible, one would have to assume that DALRP rules required entities in Lincoln's position to run their BTMG at the highest possible level when setting their baseline.  But, that assumption cannot be squared with FERC's assertions elsewhere in its Complaint.  Specifically, the Complaint states that BTMG is an "appropriate" means of providing demand response, *id*. at ¶ 26 (emphasis added), and it acknowledges that to provide demand response, one can run BTMG at "a higher level."  *Id*.  Hence, FERC acknowledges that, when setting the baseline, BTMG does not have to be run at maximum capacity, contradicting the fundamental assumption on which its case rests.  FERC's conclusion that Lincoln's baseline was false is also undermined by FERC's admission that Lincoln's initial 19 MW baseline was *less than* the mill's "normal" 20MW energy usage.  *Id.* at ¶ 33 ("the Mill's electricity consumption was approximately 20 MW").

FERC's allegation that Lincoln sought to "freeze" its baseline and never had any

intention of providing demand response is similarly implausible.  The Complaint does *not* allege that Lincoln *ever* failed to provide the load reduction for which it contracted with ISO-NE.  And, in actuality, Lincoln's baseline changed at least nine times, moving both *up and down*, during the relevant period.  *See* Ex. 2 [Lincoln's Show Cause Answer] at 4.

### C.      FERC Fails to Adequately Plead that Lincoln Acted with *Scienter*

FERC fails to allege any facts, either alone or in conjunction, that create a "strong inference" that Lincoln acted with the *scienter* required to state a claim under Section 222.  The Supreme Court has concluded that to plead *scienter* a plaintiff must allege facts that a defendant acted with "a mental state embracing intent to deceive, manipulate, or defraud."  *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n.12 (1976).  And the First Circuit requires a plaintiff to "set forth facts giving rise to a '*strong inference*' that the defendant[] acted with the required state of mind."  *SEC v. Durgarian,* 477 F. Supp. 2d 342, 353 (D. Mass. 2007) (citations omitted) (emphasis added).

The Complaint does not meet this high hurdle.  While FERC asserts that Lincoln "knew," "realized," "expected" and "intended to commit fraud," (Compl. at ¶¶ 40, 42, 44, and 48), FERC alleges *no facts* connecting these bare assertions to Lincoln's state of mind.  The Complaint does not cite to internal communications, memoranda or other documents, nor to any statements made during depositions to support its conclusions.  Nor does FERC plead that Lincoln concealed any relevant facts from anyone.  Instead, FERC claims that "Lincoln demonstrated scienter by intentionally curtailing its generator during the initial baseline-setting period and submitting demand response bids almost every hour of every day during its participation in the DALRP."  Compl. at ¶ 76.  Thus, FERC attempts to bootstrap *scienter* off its own conclusion that Lincoln's baseline was set incorrectly.  FERC's argument can be distilled down to the claim that because it was obvious (in FERC's view) that DALRP did not permit the curtailment of BTMG when

setting a baseline, and because Lincoln knowingly curtailed its BTMG, Lincoln must have had the intent to defraud.  But this tautological strict liability cannot hold up to scrutiny (especially, where, as here, FERC cannot cite to a single rule or statement showing that DALRP in fact prohibited such curtailment) and does not meet the pleading requirements for *scienter*.[44]

The few other unsupported and disjointed allegations that FERC does offer do not imply, let alone demonstrate, *scienter*.  In the First Circuit, "inferences of scienter survive a motion to dismiss only if they are both reasonable and '*strong*' inferences."  *Greebel v. FTP Software, Inc*., 194 F.3d 185, 195-96 (1st Cir. 1999) (emphasis in original).  FERC's scattershot allegations do neither.  For example, FERC asserts that it cost Lincoln $10,000 to curtail the Westinghouse and buy energy from the grid instead, and that this was somehow economically irrational.  *See* Compl. at ¶¶ 39-40, 76.  But FERC's bare assertion does not explain why Lincoln's actions were irrational, or even suggest why it would have been improper for Lincoln to (rationally) treat this expenditure as a cost of doing business that would be recouped from future DALRP revenues.  And, in any event, FERC does not allege any *facts* showing that Lincoln knew at the time it set its baseline that curtailing the Westinghouse was improper or would cost $10,000.[45]

FERC also highlights Lincoln's "use of the TG3" and argues in conclusory fashion that

---

[44]  In *Coyne v. Metabolix, Inc.,* 943 F. Supp. 2d 259 (D. Mass. 2013) (Woodlock, J.), this Court explained that "[a] plaintiff must allege specific facts supporting the inference that Defendants knew that a statement was false or misleading," *id.* at 272 (citing *Greenstone v. Cambex Corp.*, 975 F.2d 22, 25 (1st Cir. 1992)), and concluded that the plaintiff did not "support any inference that Defendants had some consciousness that any public statement was materially false or misleading." *Id.  See also In re Goodyear Tire & Rubber Co. Sec. Litig.*, 436 F. Supp. 2d 873, 892 (N.D. Ohio 2006) (citing *Helwig v. Vencor, Inc.*, 251 F.3d 540, 551 (6th Cir. 2001)).

[45]  In any event, the $10,000 figure was *de minimis* in the context of Lincoln's electricity purchases at the time (which amounted to more than $1 million per month) and thus the decision to incur that cost, even if it were known, should not be seen in hindsight as economically irrational.  The Day-Ahead LMP in New England during 2007 and 2008 ranged between the low-$50s up to around $100/MWh.  *See* Ex. 13 [ISO-NE, Monthly Summary of Historical Hourly Data by Load Zone, *available at* http://www.iso-ne.com/markets/hstdata/znl_info/monthly/index.html].   Using an average midpoint cost of $75/MWh, multiplying by an hourly load of 19 MW, by 24 hours a day, and by 30 days in a month, results in an average monthly total of $1,026,000 for Lincoln's electricity consumption.

this "reaffirms the *conclusion* that Lincoln intended to commit fraud."   *Id.* at ¶ 48 (emphasis added).   But FERC does not explain how it reaches this conclusion, and FERC does not allege any facts indicating that Lincoln had anything other than a legitimate business purpose for installing the new TG3.   Indeed, FERC acknowledges that Lincoln "notified Constellation that it planned on adding the TG3 generator to produce additional energy on-site," *id.*, and, admits that, at the least, "running an on-site generator at higher levels (and thereby taking less electricity off the grid)" was an "*acceptable way*" to participate in DALRP.   *Id.* at ¶¶ 25-26 (emphasis added).   Thus, FERC admits Lincoln did not seek to conceal its use of the TG3, and that it *was not improper* for Lincoln to use the TG3 to provide demand response.

FERC describes part of the alleged scheme as Lincoln's attempt to "freeze" its baseline by offering to reduce demand at the minimum offer price of $50/MWh "knowing" that its offers would be accepted.   *Id.* at ¶ 42.   FERC adds that Lincoln "verified" with Constellation how its baseline would change as a result.   *Id.* at ¶ 43.   But, contrary to any inference of *scienter*, Lincoln's practice here was similar to those of the *majority* of DALRP participants.   *See* Ex. 5 at 11.   Did all those entities engage in fraud?   Of course not.   This instead demonstrates only that Lincoln interpreted ISO-NE's rules in a manner similar to the *majority* of the other DALRP participants.   The fact that Lincoln "verified" the effect its offers had on its baseline, was also proper and does not imply *scienter* because Lincoln needed to track such changes in order to know where its baseline was set to determine how much demand response it could offer.[46]

---

[46]   FERC also alleges that Lincoln did not respond to emails and calls from Constellation about the new TG3 (Compl. at ¶¶ 48-50), or to a form letter dated January 23, 2008 from Constellation expressing concerns that "some of its customers" might be violating the DALRP rules.   *Id.* at ¶¶ 53-54.   *See also* Ex. 14 [January 23, 2008 Letter from Peter Kelly-Detwiler (Constellation) to Mike Brennan (Lincoln)].   But Lincoln had no duty to respond to Constellation and thus, no inference can be drawn from its alleged "silence."   *See, e.g.*, *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988) ("Silence, absent a duty to disclose, is not misleading"); Order No. 670 at 35 (the Anti-Manipulation Rule does not "create an affirmative duty to disclose," and failure to disclose

[Footnote continued on next page]

34

### D.   FERC Fails to Adequately Plead That Lincoln's Conduct Was in Connection With a FERC-Jurisdictional Transaction

FERC has also failed to adequately plead that Lincoln's alleged violations were "in connection with" a FERC-jurisdictional transaction.   Instead, FERC's Complaint merely concludes that FERC "found that Lincoln's fraudulent scheme was in connection with a [FERC-]jurisdictional transaction," and that ISO-NE's markets and "ISO-NE's [FERC]-approved DALRP" are "within [FERC's] jurisdiction."   Compl. at ¶¶ 80, 81.   But FERC has not alleged any *facts* supporting its conclusions, nor identified any FERC-jurisdictional transactions that Lincoln's conduct may have affected.   Nor could it, given that the Complaint addresses retail non-purchases by Lincoln that are not within FERC's jurisdiction.   *See supra* Section II.

---

[Footnote continued from previous page]

    information is not a violation of the rule "[a]bsent a tariff requirement or [FERC] directive mandating disclosure.").   And FERC has not pled who made the alleged calls, who they were made to, or when the alleged calls were made.   *Scienter* cannot be inferred from a failure to respond to unidentified phone calls.   Finally, the January 23, 2008 letter appears to be a form letter that contains no information specific to Lincoln (it refers only to "some customers" without more).   *See* Ex. 14.   The failure to respond to a form letter, where there is no duty to respond, obviously cannot create a "strong inference" of *scienter*.

## CONCLUSION

For the reasons stated herein, Lincoln respectfully requests that the Court dismiss the

Complaint with prejudice, and grant such other and further relief as it deems just and proper.

/s/ William S. Scherman
William S. Scherman (admitted *pro hac vice*)
Brandon C. Johnson (admitted *pro hac vice*)
Jason J. Fleischer (admitted *pro hac vice*)
Janine L. Durand (admitted *pro hac vice*)
Kara B. Coen (BBO # 676731)
Gibson Dunn & Crutcher LLP
1050 Connecticut Ave, N.W.
Washington, DC 20036-5306
(202) 955-8500
(202) 467-0539 (facsimile)
WScherman@gibsondunn.com
BCJohnson@gibsondunn.com
JFleischer@gibsondunn.com
JDurand@gibsondunn.com
KCoen@gibsondunn.com

David J. Kerstein (admitted *pro hac vice*)
Gibson Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166-0193
(212) 351-4000
(212) 351-4035 (facsimile)
DKerstein@gibsondunn.com

Dated: February 14, 2014

## <u>CERTIFICATE OF SERVICE</u>

I, Jason J. Fleischer, certify that on February 14, 2014, I caused a copy of the foregoing document to be filed through the CM/ECF system, and that a copy of the document will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ Jason J. Fleischer
Jason J. Fleischer